# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2020AP298-CR

†Petition for Review Filed

Complete Title of Case:

**STATE OF WISCONSIN,**

  **PLAINTIFF-RESPONDENT,†**

  **V.**

**JOSEPH G. GREEN,**

  **DEFENDANT-APPELLANT.**

---

| | |
|---|---|
| Opinion Filed: | February 25, 2021 |
| Submitted on Briefs: | October 16, 2020 |

---

| | |
|---|---|
| JUDGES: | Fitzpatrick, P.J., Kloppenburg, and Nashold, JJ. |
| Concurred: | |
| Dissented: | |

---

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Kathilynne A. Grotelueschen*, assistant state public defender of Madison. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Maura Whelan*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

COURT OF APPEALS
DECISION
DATED AND FILED

February 25, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP298-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF3109

IN COURT OF APPEALS

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

JOSEPH G. GREEN,

   DEFENDANT-APPELLANT.

APPEAL from orders of the circuit court for Dane County: VALERIE BAILEY-RIHN, Judge. *Reversed and cause remanded with directions*.

Before Fitzpatrick, P.J., Kloppenburg, and Nashold, JJ.

¶1    KLOPPENBURG, J.   Joseph G. Green appeals the circuit court's order for commitment and for involuntary medication, issued pursuant to WIS.

STAT. § 971.14 (2017-18),[1] to render Green competent to be tried for first-degree intentional homicide. Green also appeals the court's subsequent order lifting the automatic stay of the involuntary medication order. Green argues that: (1) the State did not present evidence sufficient to support the involuntary medication order under the constitutional standard announced in *Sell v. United States*, 539 U.S. 166 (2003) (the *Sell* factors);[2] (2) the circuit court did not "have authority" to toll the statutory period to commit Green in order to bring him to competency during the time that the involuntary medication order was stayed;[3] and (3) the circuit court did not "have authority" to hear the State's motion to lift the automatic stay of the involuntary medication order.[4]

¶2    We conclude that, considering all of the evidence the State presented before the circuit court, the State did not meet its evidentiary burden on the order

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] In *State v. Fitzgerald*, our supreme court held that "circuit courts may order involuntary medication to restore trial competency under WIS. STAT. § 971.14 only when the order complies with the [four-factor] *Sell* standard." *State v. Fitzgerald*, 2019 WI 69, ¶¶2, 26-29, 387 Wis. 2d 384, 929 N.W.2d 165 (referencing *Sell v. U.S.*, 539 U.S. 166 (2003)).

[3] The circuit court ordered on February 10, 2020, that Green be committed to the Department of Health Services "for an indeterminate term not to exceed 12 months," consistent with WIS. STAT. § 971.14(5) which provides that "[i]f the court determines that the defendant is not competent but is likely to become competent within the period specified in this paragraph if provided with appropriate treatment, the court shall suspend the proceedings and commit the defendant to the custody of the department [of health services] for a period not to exceed 12 months."

[4] Green makes a fourth argument, that the circuit court erred in reopening the evidence regarding the involuntary medication order at the hearing on the State's motion to lift the automatic stay of that order. In light of our conclusions as to the three issues stated in the text, we need not and do not address this argument. *See League of Women Voters of Wisconsin Educ. Network, Inc. v. Walker*, 2013 WI App 77, ¶93 n.13, 348 Wis. 2d 714, 834 N.W.2d 393 ("appellate courts need not address non-dispositive issues").

for involuntary medication because it failed to present an individual treatment plan based on a medically informed record. The order for involuntary medication must therefore be reversed, along with the subsequent order lifting the automatic stay of that order.[5] We also conclude that the circuit court lacked the authority to toll the statutory period to commit Green in order to bring him to competency while the stay was in place. Green must therefore be discharged from the commitment because the statutory commitment period has expired. In light of these conclusions, the remaining issue, whether the circuit court had the authority to hear the motion to lift the automatic stay, is moot. However, because this issue is likely to recur and is of statewide interest,[6] we address it and conclude that the circuit court had the authority to hear the motion to lift the automatic stay. Accordingly, we reverse and remand to the circuit court with directions to discharge Green from commitment to the Department of Health Services.

---

[5] In addition, we also vacate this court's previous order lifting the automatic stay in denying Green's motion for relief pending appeal.

[6] This same issue is also currently before this court in *State v. Engen*, No. 2020AP160-CR.

> We will consider a moot point 'if the issue has great public importance, a statute's constitutionality is involved, or a decision is needed to guide the trial courts.' Furthermore, we take up moot questions where the issue is 'likely of repetition and yet evades review' because the situation involved is one that typically is resolved before completion of the appellate process.

*State ex rel. Olson v. Litscher*, 2000 WI App 61, ¶3, 233 Wis. 2d 685, 608 N.W.2d 425 (quoted sources omitted). We take up the moot issue presented by this case because the constitutional rights at stake are of statewide importance, and the issue is likely to recur in future cases where an order for involuntary medication is entered to bring a defendant to competency and the State moves to lift the automatic stay of that order.

## BACKGROUND

¶3     The following facts are undisputed.  On December 27, 2019, Green was charged with first-degree intentional homicide.  At defense counsel's request, the circuit court ordered a competency evaluation.  Doctor Craig Schoenecker, a court-appointed psychiatrist, conducted a one-hour evaluation of Green and drafted a four-page report stating his opinion that Green suffered from "Other Specified Schizophrenia and other Psychotic Disorder," that Green was incompetent to understand court proceedings and to assist in his own defense, and that Green could be rendered competent through treatment with antipsychotic medication.  At the competency hearing held on February 10, 2020, Schoenecker testified and his report was admitted into evidence.

¶4     Schoenecker testified that Green exhibited symptoms of an extensive delusional belief system that included delusions regarding his criminal case and his attorney.  Schoenecker testified that, if Green's psychotic delusions were treated with antipsychotic medication, Green would be substantially likely to become competent within the twelve-month period allowed by law.  Finally, Schoenecker testified that psychiatric medication was medically appropriate and substantially unlikely to have side effects that would undermine the fairness of the trial, and that treatments less intrusive than involuntary medication were unlikely to restore Green to competency.

¶5     At the conclusion of the competency hearing, the circuit court found Green incompetent based on Schoenecker's testimony and report.  The court also determined that the State showed by "clear and convincing" evidence that the *Sell* factors were met, ordered that Green be committed to the Department of Health

4

Services for "an indeterminate term not to exceed 12 months," and issued an order for involuntary medication.

¶6      On February 11, 2020, Green appealed the involuntary medication order and moved for an automatic stay of the order. At a hearing on the motion for a stay, the parties agreed that Green was entitled to an automatic stay,[7] and the circuit court stayed the order for involuntary medication until further order of the court.

¶7      The State subsequently filed motions to lift the automatic stay and to toll the statutory period to bring Green to competency during the time that the stay was in place. The circuit court determined that it was proper for the circuit court to hear the State's motion to lift the automatic stay and scheduled an evidentiary hearing on both of the State's motions for May 19, 2020.

¶8      At that hearing, the circuit court allowed the State, over Green's objection, to supplement the record with additional evidence regarding the order for involuntary medication that went beyond the evidence the State had presented at the competency hearing. At the hearing, the State presented additional evidence comprising a "Notice of Treatment Plan" that had been filed by the State and was signed by the prosecutor, Schoenecker's five-page report of a second competency evaluation of Green, and Schoenecker's testimony regarding his report and the State's treatment plan.

¶9      At the conclusion of the hearing, the circuit court made findings of fact and once again determined that the *Sell* factors were satisfied. The court

---

[7] In *State v. Scott*, our supreme court held "that involuntary medication orders are subject to an automatic stay pending appeal." *State v. Scott*, 2018 WI 74, ¶43, 382 Wis. 2d 476, 914 N.W.2d 141.

granted the State's motion to lift the automatic stay of the involuntary medication order based on its determination that the State was likely to succeed on appeal and that lifting the stay would not cause irreparable harm to Green, substantial harm to any other interested parties, or harm to the public.[8] The circuit court also granted the State's motion to toll the statutory period to bring Green to competency.

¶10 Green moved this court for relief pending appeal and we granted a temporary stay of the involuntary medication order. After further briefing, we denied Green's motion for relief pending appeal and lifted the temporary stay.

¶11 We present additional undisputed facts as pertinent in the discussion below.

## DISCUSSION

¶12 We discuss in turn each of the three issues presented on appeal.

### I. Order for Involuntary Medication

¶13 Green argues that the order for involuntary medication must be reversed because the State did not present evidence sufficient to satisfy the constitutional standard announced in *Sell*. We first present the standard of review and general legal principles. We next provide additional pertinent background. Finally, we explain why we conclude that the State failed to present evidence sufficient to satisfy the *Sell* standard and that the involuntary medication order must, therefore, be reversed.

---

[8] These are the factors that the State must show on a motion to lift an automatic stay pending appeal of an involuntary medication order. *Scott*, 382 Wis. 2d 476, ¶47.

*A. Standard of Review and General Legal Principles*

¶14 "In *Sell*, the United States Supreme Court held that in limited circumstances the government may involuntarily medicate a defendant to restore his [or her] competency to proceed to trial, and it outlined four factors that must be met before a circuit court may enter an order for involuntary medication." *State v. Fitzgerald*, 2019 WI 69, ¶2, 387 Wis. 2d 384, 929 N.W.2d 165.[9] These four factors, which we next explain in detail, are that: (1) the government has an important interest in proceeding to trial; (2) involuntary medication will significantly further the governmental interest; (3) involuntary medication is necessary to further the governmental interest; and (4) involuntary medication is medically appropriate. *Id.*, ¶¶14-17.

¶15 Our supreme court in *Fitzgerald*, 387 Wis. 2d 384, provided the following explanation of the *Sell* standard's four factors, from which we now quote at length:

> Under the Due Process Clause, individuals have "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs" ... "[O]nly an 'essential' or 'overriding' state interest" can overcome this constitutionally-protected liberty interest. *Sell*, 539 U.S. at 178-79…. In *Sell*, the United States Supreme Court addressed "whether the Constitution permits the Government to administer antipsychotic drugs involuntarily to a mentally ill criminal defendant—in order to render that defendant competent to stand trial for serious, but nonviolent, crimes." *Sell*, 539 U.S. at 169. The Court held that it does, but only under particular circumstances:

---

[9] The only question here is whether Green should be medicated for purposes of bringing him to competency. As noted in *Fitzgerald*, and quoting *Sell*, our supreme court recognizes that a different test applies to the question of whether Green may be forced to take medication for a purpose such as his dangerousness under WIS. STAT. § 971.14(2)(f). *Fitzgerald*, 387 Wis. 2d 384, ¶18 (majority opinion) and ¶42 (Roggensack, C.J., concurring).

[T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary to significantly further important governmental trial-related interests.

Although permissible in certain situations, the *Sell* Court explained that the "administration of drugs solely for trial competence purposes ... may be rare." *Id.* at 180. The Court established a four-factor test to determine whether such medication is constitutionally appropriate.

"First, a court must find that important governmental interests are at stake." *Id.* "[B]ringing to trial an individual accused of a serious crime" against a person or property is an important interest. *Id.* The Court did, however, emphasize that prior to entering an order for involuntary medication, courts "must consider the facts of the individual case in evaluating the Government's interest in prosecution." *Id.*

"Second, the court must conclude that involuntary medication will significantly further" the government's interest in prosecuting the offense. *Id.* at 181. This means that a court "must find that administration of the drugs is substantially likely to render the defendant competent to stand trial" and "unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.*

"Third, the court must conclude that involuntary medication is necessary to further those interests." *Id.* In other words, "[t]he court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id.* In order to make this finding, the deciding court "must consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Id.* In other words, the *Sell* Court considered an order directed at the defendant, requiring him [or her] to accept medication or be found in contempt of court, to be less intrusive than ordering an entity like DHS to forcibly administer medication to the defendant.

8

> "Fourth, ... the court must conclude that administration of the drugs is <u>medically appropriate</u>, <u>i.e.</u>, in the patient's best medical interest in light of his [or her] medical condition." *Id.* The *Sell* Court explained that "[t]he specific kinds of drugs at issue may matter here as elsewhere" because "[d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Id.*

> The Court explained that "these standards ... seek[ ] to determine whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant <u>competent to stand trial</u>[.]"

*Fitzgerald*, 387 Wis. 2d 384, ¶¶13-18 (alterations in original and citations omitted).

¶16 Thus, to briefly summarize, the *Sell* standard requires that: (1) the government has an "important" interest in prosecuting a "serious crime"; (2) forced medication will "significantly further" the governmental interest because it is substantially likely to render the defendant competent and substantially unlikely to have side effects that interfere with the defense; (3) involuntary medication is necessary to further the governmental interest in that there are no less intrusive but similarly effective alternatives; and (4) medication is "medically appropriate," meaning that it is in the defendant's best medical interest in light of his or her medical condition. *Id.* If each factor is satisfied, involuntary medication is permissible. *Sell*, 539 U.S. at 179. If any factor is unsatisfied, involuntary medication is a violation of the Due Process Clause and is unconstitutional. *Sell*,

539 U.S. at 179. The State is required to prove the factual components of each of the four factors by clear and convincing evidence.[10]

¶17   Here, the parties agree that the first *Sell* factor is satisfied, and so our analysis is directed only at the remaining three factors.

¶18   "The *Sell* Court did not specify a standard for reviewing *Sell* orders," *United States v. Grape*, 549 F.3d 591, 598 (3d Cir. 2008), nor have Wisconsin courts specified the standard of review governing a circuit court's determination of whether these four factors are satisfied.

¶19   The State cites the standard of review followed by the federal courts in treating the second through fourth *Sell* factors as questions of fact subject to clearly erroneous review. *See, e.g., United States v. Gomes*, 387 F.3d 157, 160 (2nd Cir. 2004) (stating that the clearly erroneous standard is used because the second

---

[10] The "clear and convincing" standard of proof is an "intermediate" standard of proof (between the "beyond a reasonable doubt" of criminal proceedings and the "preponderance of the evidence" of most civil proceedings), applied in this context to "protect particularly important individual interests" where the outcome of the proceeding is "of such weight and gravity" that due process under the Fourteenth Amendment requires the State to meet a "proof more substantial than a mere preponderance of the evidence." *Addington v. Texas*, 441 U.S. 418, 424, 427 (1979). All ten federal circuit courts that have considered the question agree that the "the government must provide clear and convincing evidence under the four-prong test before an accused may be forcibly medicated." *United States v. James*, 938 F.3d 719, 723 (5th Cir. 2019) (noting, "Nine of our sister circuits take the same view today," and cataloguing federal cases, *id.*). *See also Matter of D.K.*, 2020 WI 8, ¶¶28-29, 390 Wis. 2d 50, 937 N.W.2d 901 (due process demands the clear and convincing standard for civil commitment cases).

through fourth *Sell* factors are "factual in nature").[11] Green, citing our supreme court's decision in ***Langlade County v. D.J.W.***, 2020 WI 41, ¶47, 391 Wis. 2d 231, 942 N.W.2d 277, argues that the second through fourth *Sell* factors are legal questions reviewed de novo.[12] Both parties frame their arguments in terms of whether the evidence here is sufficient to satisfy the second through fourth *Sell* factors.

¶20 We need not resolve the parties' dispute as to the standard of review because we, like the parties, address whether the State presented evidence to show

---

[11] *See also **United States v. Mikulich***, 732 F.3d 692, 696 (6th Cir. 2013) (holding that first *Sell* factor is reviewed de novo and remaining factors are reviewed under clearly erroneous standard); ***United States v. Grape***, 549 F.3d 591, 598 (3rd Cir. 2008) (same); ***United States v. Palmer***, 507 F.3d 300, 303 (5th Cir. 2007) (same); ***United States v. Evans***, 404 F.3d 227, 236 (4th Cir. 2005) (same); ***United States v. Diaz***, 630 F.3d 1314, 1331 (11th Cir. 2011) (same); ***United States v. Gillenwater***, 749 F.3d 1094, 1101 (9th Cir. 2014) (same); ***United States v. Fazio***, 599 F.3d 835, 839–40 (8th Cir. 2010) (same). *But see **United States v. Bradley***, 417 F.3d 1107, 1113–14 (10th Cir. 2005) (holding that *Sell* factors one and two are legal questions reviewed de novo, whereas factors three and four are factual findings reviewed under clearly erroneous standard).

The federal clearly erroneous review standard is meaningfully the same as Wisconsin's clearly erroneous review standard. The clearly erroneous standard of review in federal courts comes from Federal Rule of Civil Procedure 52(a), which provides: "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52. The Wisconsin Rules of Civil Procedure contain an almost identical rule: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." WIS. STAT. § 805.17(2).

"A finding is clearly erroneous if it is against the great weight and clear preponderance of the evidence." ***State v. Arias***, 2008 WI 84, ¶12, 311 Wis. 2d 358, 752 N.W.2d 748 (internal citations and quotation marks omitted).

[12] ***Langlade County v. D.J.W.***, 2020 WI 41, ¶2, 391 Wis. 2d 231, 942 N.W.2d 277, is a Chapter 51 civil commitment case. The issue on appeal was whether D.J.W. was "dangerous" under the statute; more specifically, whether D.J.W. was currently dangerous because, if treatment were withdrawn, he would still meet one of the statutory standards of dangerousness. *Id.*, ¶¶48-50. Our supreme court stated: "At the outset of our examination of this question, we observe that the court of appeals in this case applied a clearly erroneous standard to a determination of dangerousness…. A determination of dangerousness is not a factual determination, but a legal one based on underlying facts. The Court of Appeals thus erred by applying the standard of review for findings of fact to a legal determination of dangerousness." ***D.J.W.***, 391 Wis. 2d 231, ¶47.

that the second through fourth *Sell* factors were met and reach the same conclusion regardless of whether we apply "clearly erroneous" or "de novo" review.

## *B. Additional Background*

¶21 At the time of the hearing on the State's motion to lift the automatic stay of the circuit court's involuntary medication order, Green was on the waiting list for treatment at the Mendota Mental Health Institute (Mendota). Schoenecker testified at that hearing that he was not involved in prescribing medications for Green, that he had not reviewed medical records for Green, that the providers who would treat Green at Mendota had not met Green yet, and that it would be "outside of professional guidelines and standards of care to prescribe medication to someone independent of some form of assessment and/or treatment relationship."

¶22 Schoenecker testified as to the State's proposed treatment plan, which had been submitted before the hearing by the assistant district attorney but which was not signed by any physician. The plan provided that Green would be administered Haldol at a maximum dose of ten milligrams per day and a maximum of 400 milligrams per month for a period not to exceed twelve months. Schoenecker testified that the amounts identified in the State's proposed treatment plan were "consistent with what the FDA has authorized as conventional or appropriate doses." Schoenecker indicated that he had spoken to someone at Mendota about that treatment plan and testified that Mendota staff would meet with Green personally, review Green's medical records, and prescribe Haldol only after Green was evaluated "face-to-face" by both a psychiatrist and an internist, "the internist … specifically with the purpose of focusing on acquiring medical history and identifying any potential comorbid medical conditions [Green] might suffer from or that are in need of treatment."

¶23     Regarding Haldol's side effects, Schoenecker testified:

> Haldol certainly can cause side effects, including sedation, slurred speech, a tremor, a feeling of muscle restlessness that we refer to as akathisia, a phenomenon that is certainly like tremors but referred to as parkinsonism because it mimics the appearance of individuals who have Parkinson's disease. It has the potential to affect cardiac conduction and heart rhythm. It has an impact on what's called the QT interval, which is part of the electrocardiograph rhythm, and it can certainly have some metabolic side effects as well in terms of its impacts on weight gain and blood sugar.

¶24     Schoenecker testified that persons taking Haldol could develop diabetes and that the likelihood of developing diabetes while on Haldol depended on "many variables … from medication dose to duration of exposure to underlying family history to diet to exercise status."

¶25     Schoenecker testified that the likelihood of side effects occurring "can range from single-digit percentages, say 5 to 8 percent, up to as high as 25 to 35 percent," and that whether the side effects would interfere with an individual's ability to assist counsel in conducting a trial "hinges on the severity" of those side effects. Using sedation as an example, he explained, "I would anticipate a very mild amount of sedation would have minimal impact on one's abilities versus a tremendous amount of sedation could certainly substantially impact a person's ability in that regard." He testified that, if Haldol were to have side effects that interfered with an individual's ability to assist counsel in conducting a trial, the "most typical approach that the treating psychiatrist would likely take" would be to try a different antipsychotic treatment plan.

¶26     Schoenecker was asked for his professional opinion as to whether Haldol was substantially likely to render Green competent to stand trial. He responded, "Certainly on paper Haldol would be an appropriate treatment. My

13

hesitation is borne of the fact that individuals' responses to particular medications can vary. And so there's not a single antipsychotic medication that is universally effective." Schoenecker testified that whether Mendota would proceed with the Haldol treatment plan proposed by the State, or a different treatment plan, would be determined by treatment providers at Mendota based on information from Green's medical records.

¶27 Asked whether less intrusive treatments were likely to achieve substantially the same results as the proposed Haldol treatment, Schoenecker testified: "It's my opinion, to a reasonable degree of medical certainty, that non-medication interventions are unlikely to restore the defendant's capacities."

¶28 The circuit court determined that the State had an important interest in bringing Green to trial (first *Sell* factor). It found, "based on the doctor's testimony and expertise," that: the administration of Haldol would be substantially likely to render Green competent to stand trial and Haldol was unlikely to have side effects that would interfere significantly with Green's "ability to conduct a trial defense" (second *Sell* factor); because Green "does not believe he's mentally ill," no method less intrusive than involuntary medication was likely to achieve substantially the same results (third *Sell* factor); and the Haldol treatment plan was in Green's best interests in light of his medical condition because "if left untreated, the situation gets worse" and Haldol "has minimal side effects on this level of dosage for this limited time frame" (fourth *Sell* factor). The court ordered that Green accept the medication as stated in the State's treatment plan or be found in contempt, and that if he did refuse the medication then "Mendota would be entitled to forcibly administer the medication."

*C. Analysis*

14

¶29 We now examine whether the circuit court's determinations that the second through fourth *Sell* factors were met are supported by the evidence in the record. To repeat, the second factor is whether involuntary medication will "significantly further" the governmental interest in prosecuting Green because it is substantially likely to render him competent to stand trial and substantially unlikely to have side effects that interfere with the defense; the third factor is whether the order is necessary to further the governmental interest, meaning that there are no other less intrusive alternatives; and the fourth factor is whether the medication is "medically appropriate," meaning that it is in Green's best medical interest in light of his medical condition. *Sell*, 539 U.S. at 180-81; *Fitzgerald*, 387 Wis. 2d 384, ¶¶13-18. As we explain, we conclude that the evidence in the record supports the court's determination that the third factor was met but does not support the court's determinations that the second and fourth factors were met. Because our analysis and the parties' arguments on the second and fourth factors intertwine, we discuss those factors after we discuss the third factor.

### 1. Third *Sell* Factor

¶30 As to the third factor, we conclude that the evidence supports the circuit court's determination that an involuntary medication order was necessary because there were no less intrusive alternatives likely to achieve substantially the same result. That evidence is comprised primarily of Schoenecker's testimony that "non-medication interventions are unlikely to restore the defendant's capacities." We now explain why we reject Green's argument to the contrary.

¶31 Green argues that, by simultaneously ordering both that Green take the medication voluntarily or be found in contempt and that involuntary medication could be administered if Green refused to voluntarily take the medication, the circuit

15

court "made an explicit finding" that a less intrusive method (the contempt power) was available. However, this argument ignores the circuit court's reliance on evidence that Green "does not believe he's mentally ill" and was therefore unlikely to voluntarily accept medication. The court obeyed *Sell*'s command that a circuit court "must consider less intrusive means for administering the drugs, *e.g.*, a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Sell*, 539 U.S. at 181. By entering an involuntary medication order that would become effective only after the contempt power had failed, the circuit court ensured that Green would be involuntarily administered medication only if "necessary." *Id.* The record, therefore, does not support Green's argument as to the availability of less intrusive methods than those ordered by the court.

## 2. Second *Sell* Factor

¶32 As to the second factor, we conclude that the evidence in the record does not support the circuit court's determination that involuntary administration of Haldol as proposed by the State would significantly further the government's interest in bringing Green to trial because it was substantially likely to render Green competent and substantially unlikely to have side effects that interfere with the defense. Schoenecker's testimony that "on paper Haldol would be an appropriate treatment" to render Green competent was offered as a general opinion that had no connection to Green individually, in that Schoenecker declined to opine as to Green's individual response both with regard to a return to competency and to interference with the defense. His opinion was not based on a review of Green's medical history or treatment records. He had not evaluated Green for the purpose of prescribing medication for him, nor could he prescribe medication for Green without having done so.

16

¶33   While the *Sell* standard does not require certainty but rather asks the court to make a determination about whether it is "substantially likely" that the administration of drugs will render the defendant competent, *Sell*, 539 U.S. at 181, such a "substantial likelihood" must reasonably be founded on evidence specific to the individual being involuntarily medicated.

¶34   It is not enough for the State to simply offer a generic treatment plan with a medication and dosage that are generally effective for a defendant's condition.   Rather, the circuit court must consider the defendant's particular circumstances and medical history to assess the underlying factual questions of whether a particular medication is substantially likely to render a particular defendant competent and substantially unlikely to have side effects that interfere with that defendant's ability to participate in his or her own defense.  "Whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence."  *Sell*, 539 U.S. at 185.  Simply matching a general treatment plan for a condition to the defendant's diagnosed condition does not satisfy *Sell*'s high standard.  Such a practice would reduce orders for involuntary medication to a generic exercise, contrary to *Sell*'s observation that the circumstances in which orders for involuntary medication are constitutionally permissible "may be rare."  *Sell*, 539 U.S. at 180.

¶35   The reasoning of federal circuit courts that have reached the same determination strengthens our conclusion.  *See, e.g.*, *United States v. Evans*, 404 F.3d 227, 242 (4th Cir. 2005) (the government must demonstrate that "the proposed treatment plan, *as applied to this particular defendant*, is 'substantially likely' to render the defendant competent to stand trial.") (emphasis in original); *United*

*States v. Watson*, 793 F.3d 416, 424 (4th Cir. 2015) ("Merely showing a proposed treatment to be 'generally effective' against the defendant's medical condition is insufficient" to meet the government's burden on second *Sell* factor) (quoted source omitted); *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1137 (9th Cir. 2005) ("Subsequent to *Sell*, we held that in light of the importance of judicial balancing, and the implication of deep-rooted constitutional rights, a court that is asked to approve involuntary medication must be provided with a complete and reliable medically informed record, based in part on independent medical evaluations, before it can reach a constitutionally balanced *Sell* determination.").

¶36    We now explain why we reject the State's argument that the second *Sell* factor was satisfied.

¶37    The State concedes that, under *Sell* case law, "an individualized treatment plan is a universal requirement" and "[a]n individualized treatment plan is the necessary first step to fulfilling the second, third, and fourth *Sell* requirements." The State asserts that it provided such an individualized treatment plan at the second hearing[13] and that Schoenecker's testimony at that hearing regarding the State's treatment plan satisfied the State's burden to show by clear and convincing evidence that involuntary medication was "substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist

---

[13] Specifically, the State asserts that here, after conducting a three-month update of his evaluation of Green, Schoenecker "had developed an individualized treatment plan." That assertion is not supported by the record. As noted above, the treatment plan is signed by the assistant district attorney. Schoenecker testified that he spoke with Mendota about the treatment plan, but there is no evidence indicating who developed the treatment plan.

counsel in conducting a trial defense" as required by the second *Sell* factor. *Sell*, 539 U.S. at 181.

¶38 As the State explains, *Sell* requires an individualized treatment plan that, "[a]t a minimum," identifies "(1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court...." *United States v. Chavez*, 734 F.3d 1247, 1253 (10th Cir. 2013) (citing *United States v. Hernandez-Vasquez*, 513 F.3d 908, 916-17 (9th Cir. 2008)). However, it is not enough that the State merely present a treatment plan that identifies the medication, dosage, and duration of treatment. *Cf. Evans*, 404 F.3d at 241–42 ("While it is necessary for the government to set forth the particular medication and dose range of its proposed treatment plan, such a description alone is not sufficient to comply with *Sell*."). Instead, the court must consider the individualized treatment plan as applied to the particular defendant. The defendant's age and weight, the duration of his or her illness, his or her past responses to psychotropic medications, his or her cognitive abilities, other medications he or she takes, and his or her medical record may all influence whether a particular drug given at a particular dosage for a particular duration is "substantially likely" to render the defendant competent. *Cf. Watson*, 793 F.3d at 424 (courts must consider "not only [the defendant's] medical condition, but also his [or her] age and the nature and duration of his [or her] delusions.").

¶39 Here, Schoenecker testified to side effects, such as sedation and slurred speech that, if "severe," would tend to make it unlikely that Green would be rendered competent to stand trial. The State did not present any evidence as to whether Green in particular would be likely to have severe side effects.

19

Schoenecker did not review Green's medical records and the record lacks even basic physical health information such as Green's height, weight, vitals, and current medications. The circuit court was therefore unable to consider whether Green already took other medications that tended to sedate him or whether the dosage was appropriate for someone of Green's age and weight and medical history. Schoenecker's initial competency report documents Green's statement that he had previously been prescribed an antipsychotic medication that "made [him] psychotic," yet the record is bereft of any information about the type or dosage of Green's previous antipsychotic medication or if and how such medication may have worsened his symptoms of psychosis. The record shows that Schoenecker was unable to form an opinion "that the proposed treatment plan, *as applied to this particular defendant*, [was] 'substantially likely' to render the defendant competent to stand trial." *Evans*, 404 F.3d at 242 (emphasis in original). Accordingly, we reject the State's argument that the second *Sell* factor was satisfied.

### 3. The Fourth *Sell* Factor

¶40 As to the fourth factor, we conclude that the evidence in the record does not support the circuit court's determination that the proposed treatment plan was medically appropriate for Green. The record on which the circuit court relied shows that it was not possible to evaluate whether the treatment plan was medically appropriate for Green because there is no evidence that it had been formulated by someone who had met or evaluated Green with knowledge of Green's medical history, comorbid medical conditions, and risk factors for side effects. As Schoenecker testified, whether Haldol at the proposed dose was medically appropriate for Green could be determined only after a treating psychiatrist and internist met Green "face-to-face," at which point the treating providers would make a determination about whether the "specifics" of the proposed treatment plan were

medically appropriate for Green "based on that data" about his medical history and conditions.

¶41 We conclude that the record on which the circuit court relied to order involuntary medication—comprising testimony from a non-treating psychiatrist who interviewed Green but did not review medical history, did not perform a physical exam or evaluate for comorbidities, and did not evaluate risk factors for side effects of the proposed medication—did not provide enough information for the court to evaluate whether "administration of the drugs is <u>medically appropriate</u>, <u>i.e.</u>, in the patient's best medical interest in light of his [or her] medical condition." *Fitzgerald*, 387 Wis. 2d 384, ¶17 (citing *Sell*, 539 U.S. at 181) (emphasis in original). We now explain in turn why we reject each of the State's three arguments to the contrary.

¶42 The State argues that the circuit court appropriately relied on testimony from Schoenecker to conclude that antipsychotics were likely to have a positive effect on Green's health. However, Schoenecker's testimony about the effectiveness of antipsychotics generally in treating individuals with psychosis does not satisfy *Sell's* command that the court must conclude that administration of the drugs is "in the patient's best medical interest in light of his [or her] medical condition." *Fitzgerald*, 387 Wis. 2d 384, ¶17 (citing *Sell*, 539 U.S. at 181). *Sell* speaks of "the patient," not of a general class of persons with the patient's condition, and explains that "[t]he specific kinds of drugs at issue may matter here as elsewhere." *Sell*, 539 U.S. at 181. Whether administration of a *particular* drug is in a *particular* patient's best interests requires, as Schoenecker testified, consideration of the particular patient's medical history and conditions. It is precisely because of the need for an individualized assessment that, as Schoenecker testified, it would be "outside of professional guidelines and standards of care to

prescribe medication to someone independent of some form of assessment and/or treatment relationship."

¶43    The State next argues that the circuit court's order "will fully protect Green's rights under *Sell*" because it orders involuntary medication only upon additional assessment at Mendota.  Specifically, the State argues that the order was medically appropriate because the court directed that the treating provider was "to determine in his or her own professional judgment whether the approved treatment plan is medically appropriate for Green.  Treatment will go forward according to the order *only* if the provider determines that the treatment plan approved by the court is medically appropriate."  This argument is unpersuasive because, as the State concedes, *Sell* requires the *court* to determine whether the treatment plan is medically appropriate, and the State also concedes that the circuit court ordered in these circumstances that any change to the treatment plan must be approved by the circuit court.

¶44    Circuit courts are required to determine whether the *Sell* factors have been met before ordering involuntary medication.  *Fitzgerald*, 387 Wis. 2d 384, ¶33.  Courts cannot delegate this responsibility to a treating provider.  If courts could render an order for involuntary medication compliant with *Sell* merely by directing the treating providers to comply with the order "only if the provider determines that the treatment plan approved by the court is medically appropriate," all medication orders would satisfy *Sell*.  Nothing in *Sell* would support this kind of pro-forma review by the circuit courts.  Such review would result in outcomes that would be contrary to the admonition that "individuals have 'a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs…'" and therefore "'administration of drugs solely for trial competence purposes ... may be rare.'" *Fitzgerald*, 387 Wis. 2d 384, ¶13; *Sell* 539 U.S. at 180.

¶45    Finally, the State argues that Wisconsin competency procedure is different from federal procedure and that we should not apply federal standards to Wisconsin procedure.  Specifically, the State asserts that in the federal system the defendant, after being found incompetent, is evaluated for four months by treating medical staff who develop a particularized treatment plan that is then presented to the court for a hearing on involuntary medication.  The State asserts that Wisconsin procedure differs because both competency and involuntary medication are considered at a single hearing, and the evaluation is conducted on a shorter timeline by a contracted psychiatrist who does not treat the defendant.

¶46    This argument does not persuade, first because it ignores the dispositive issue of whether the procedure in this case satisfies *Sell*, and second because it mischaracterizes Wisconsin statutory procedures.

¶47    As the State concedes, the dispositive issue is "does the Wisconsin case at bar protect the defendant's liberty interest, by ensuring judicial oversight and satisfaction of the four *Sell* factors?"  Our supreme court has ruled that statutory provisions that do not comply with *Sell* are unconstitutional.  *Fitzgerald*, 387 Wis. 2d 384, ¶32.  Although the State is correct that no authority suggests that Wisconsin "must jettison all its statutory procedures," Wisconsin procedures must comply with *Sell* under the due process clause of the Fifth and Fourteenth Amendments.  The State does not offer any substantive argument that the two interviews here with a non-treating physician who did not consider the defendant's medical history, comorbidities, or individualized risks are sufficient to allow the circuit court to determine whether a particular medication is in the best interests of this particular defendant.  It is not the constitutional standards that must bend to accommodate Wisconsin statutory procedures, as proposed by the State, but the procedures that must bend to comply with constitutional standards.  *See Bonnett v.*

*Vallier*, 136 Wis. 193, 116 N.W. 885 (1908) (Courts are "duty bound to test a legislative enactment by all constitutional limitations bearing thereon and condemn it if it be found illegitimate and thus uphold the Constitution as superior to legislative will.").

¶48　However, we do not here conclude that Wisconsin's statutes are constitutionally infirm. Contrary to the State's argument, the Wisconsin statutes governing involuntary medication to render a defendant competent do not require that the circuit courts rely on such insubstantial evaluation. We construe statutes to determine the legislature's intent. *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶38, 271 Wis. 2d 633, 681 N.W.2d 110. We begin with the plain language of the statute. *Id.*, ¶37. "If the language is plain and unambiguous, our analysis stops there." *Wisconsin Dep't of Workforce Dev. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 2015 WI App 56, ¶7, 364 Wis. 2d 514, 869 N.W.2d 163 (citing *Kangas v. Perry*, 2000 WI App 234, ¶8, 239 Wis. 2d 392, 620 N.W.2d 429).

¶49　The State cites WIS. STAT. § 971.14 for the proposition that the Wisconsin evaluator must complete in fifteen or thirty days the work for which the federal examiner has four months. That statute indeed requires that a competency report be issued fifteen days after an order for an inpatient examination, with the option for one additional fifteen-day extension for good cause, or that the report be issued within thirty days after an order for an outpatient examination. Sec. 971.14(2)(c). The examiner's report must include "the examiner's opinion regarding the defendant's present mental capacity to understand the proceedings and assist in his or her defense" and "the examiner's opinion regarding the likelihood that the defendant, if provided treatment, may be restored to competency within the time period permitted" by statute. Sec. 971.14(3)(c)-(d).

¶50    However, WIS. STAT. § 971.14 does not require the examiner to make a determination regarding whether the defendant requires medication to be restored to competency.  Rather, it provides that "*if sufficient information is available* to the examiner to reach an opinion" on the issue, then the report shall include "the examiner's opinion on whether the defendant needs medication or treatment[.]" Sec. § 971.14 (3)(dm) (emphasis added).[14]    The State's argument that "the Wisconsin examiner cannot be expected to acquire the same level of detail or knowledge of the defendant's needs in 15 or 30 days that the federal examiner can in four months" is therefore unavailing, as the statute does not require the Wisconsin examiner to develop a specific treatment plan within that short time frame.  As Green correctly notes, "the legislature recognized that there may not be sufficient time for an examiner to reach an informed opinion regarding the involuntary administration of medication and provided that in such circumstances, an opinion on that subject was not necessary."  An examiner does not have sufficient information to form an opinion as to medication absent a medically informed record.

¶51    For the foregoing reasons, we conclude that nothing in the statutory provisions on which the State relies conflicts with the circuit court's obligation to consider particularized information about the defendant in determining whether the second and fourth *Sell* factors are satisfied.[15]

---

[14] *Fitzgerald*, 387 Wis. 2d 384, ¶32, held that certain language in WIS. STAT. § 971.14(3)(dm) is unconstitutional under *Sell*, but that language is unrelated to the statutory procedure discussed here.

[15] With our reversal of the involuntary medication order, the appeal challenging whether the circuit court properly lifted the automatic stay of that order is moot, and we therefore do not address it, except for the issue of whether the circuit court properly heard the motion to lift the stay, which we do address in the last section below.

## II. Tolling Order

¶52    Green argues that the circuit court lacked authority to grant the State's motion to toll the statutory period to bring Green to competency. This argument requires that we interpret WIS. STAT. § 971.14(5)(a)1., the commitment provision of Wisconsin's competency statute. Statutory interpretation presents a question of law that we review de novo. *State v. Stewart*, 2018 WI App 41, ¶18, 383 Wis. 2d 546, 916 N.W.2d 188, *review denied*, 2018 WI 107, ¶18, 384 Wis. 2d 774, 921 N.W.2d 510. As we explain, we conclude that the plain language of the statute does not allow for tolling.

¶53    The following are well-established principles of statutory construction in addition to those set forth in ¶48 above. "Judicial deference to the policy choices enacted into law by the legislature requires that statutory interpretation focus primarily on the language of the statute." *Kalal*, 271 Wis. 2d 633, ¶44. Thus, "[s]tatutory interpretation 'begins with the language of the statute.'" *Id.*, ¶45 (quoted source omitted). "[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole." *Id.*, ¶46. Wisconsin courts "consult our own prior decisions that examined the same statute as part of our plain meaning analysis." *Adams v. Northland Equip. Co, Inc.*, 2014 WI 79, ¶30, 356 Wis. 2d 529, 850 N.W.2d 272.

¶54    WISCONSIN STAT. § 971.14(5)(a)1. provides in pertinent part:

> If the court determines that the defendant is not competent but is likely to become competent within the period specified in this paragraph if provided with appropriate treatment, the court shall suspend the proceedings and commit the defendant to the custody of the department for treatment for a period not to exceed 12 months, or the maximum sentence specified for the most serious offense with which the defendant is charged, whichever is less.

The text unambiguously states that commitment to bring a defendant to competency is not to exceed twelve months from the date the defendant is committed to the department, even in cases where the maximum sentence specified for the most serious offense with which the defendant is charged exceeds twelve months. Construing the plain language of the statute to "determine the legislature's intent," *Kalal*, 271 Wis. 2d 633, ¶38, we conclude that the legislature intended to limit the period for which a defendant can be committed to bring him or her to competency to a maximum of twelve months.

¶55    Reading WIS. STAT. § 971.14(5)(a)1 "as part of a whole," *Kalal*, 271 Wis. 2d 633, ¶46, our interpretation is confirmed by the structure of surrounding provisions in WIS. STAT. § 971.14.  Section 971.14(5)(b) requires that the defendant be reexamined at three months, six months, nine months, and within 30 days prior to the expiration of commitment and that the examiner issue his or her opinion regarding whether the defendant has become competent or is likely to become competent "within the remaining commitment period."  Sec. 971.14(5)(b).  Section 971.14(6)(a) requires that, if the circuit court determines that "it is unlikely that the defendant will become competent within the remaining commitment period, it shall discharge the defendant from the commitment and release him or her."  These provisions confirm that an incompetent defendant may be committed for no more than twelve months and that he or she must be discharged from commitment after that period.

¶56    Our case law also confirms this reading.  Our supreme court explained in *State v. Moore*, 167 Wis. 2d 491, 481 N.W.2d 633 (1992):

> [W]e conclude that the object to be accomplished by sec. 971.14(5)(a), Stats., is to provide treatment to an incompetent person so that he or she may regain competency and face the pending criminal charges.  The commitment is

> in no way punitive, for there has been no determination of guilt.

*Moore*, 167 Wis. 2d at 498. Consistent with *Moore* and the plain language of the statute, we conclude that the legislature's intent in enacting § 971.14(5)(a)1. was to limit the time of this non-punitive commitment for the purposes of bringing a defendant to competency to no more than twelve months from the date the defendant is committed to the department.

¶57 This choice reflects the legislature's policy position in balancing the State's interest in bringing a defendant to trial with a defendant's liberty interest in his or her own freedom. Subjecting a person to confinement when there has been no determination of guilt implicates profound due process concerns. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("[A] person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future."). *Cf. State ex rel. Porter v. Wolke*, 80 Wis. 2d 197, 202-03, n.5, 257 N.W.2d 881 (1977) ("an accused found incompetent to stand trial must be released if it appears that he will not attain or regain competency within a reasonable time") (citing *Jackson*, 406 U.S. at 738). In limiting the period of commitment to bring a defendant to competency to a maximum of twelve months, the legislature has given the State an opportunity to bring defendants to competency while simultaneously ensuring that no defendant determined to be incompetent will be locked up for longer than a year on charges of which he or she has had no opportunity to prove himself or herself innocent.

¶58 "[O]ur role is not to justify the legislative action or to substitute our judgment for that of the legislature. Rather, our role is to examine and interpret the

legislative language." ***Braverman v. Columbia Hosp., Inc.***, 2001 WI App 106, ¶24, 244 Wis. 2d 98, 629 N.W.2d 66. Because tolling the statutory period for commitment may result in a defendant being held for a period longer than twelve months, such tolling is a violation of the statute's unambiguous command that commitment to bring a defendant to competency be limited to "a period not to exceed 12 months, or the maximum sentence specified for the most serious offense with which the defendant is charged, whichever is less." WIS. STAT. § 971.14(5)(a)1. We therefore show "deference to the policy choices enacted into law by the legislature," ***Kalal***, 271 Wis. 2d 633, ¶44, and conclude that a circuit court lacks authority to toll the statutory period set out by § 971.14(5).

¶59 We now explain why we reject the State's two arguments to the contrary.

¶60 First, the State argues that no statute or case law prohibits a circuit court from tolling a statutory time limit. We reject this argument because the statute here, which grants the circuit courts authority to commit an individual to bring him or her to competency, at the same time conditions that authority on compliance with specific statutory criteria. These criteria include a probable cause determination, WIS. STAT. § 971.14(1r)(c); examination of the defendant, § 971.14(2); a competency hearing, § 971.14(4); and time limits, § 971.14(5). Just as the circuit court would not be free to ignore the statute's requirement of a probable cause determination, it is not free to ignore the statute's time limit requirements. The circuit court's role is to apply the statute as written. ***State v. Chagnon***, 2015 WI App 66, ¶11, 364 Wis. 2d 719, 870 N.W.2d 27. "'In construing or interpreting a statute the court is not at liberty to disregard the plain, clear words of the statute.'" ***Kalal***, 271 Wis. 2d 633, ¶46 (quoting ***State v. Pratt***, 36 Wis. 2d 312, 317, 153 N.W.2d 18 (1967)). The statute does not need to "prohibit" tolling because the

statute contains an unambiguous time limit that the circuit court is not free to disregard.

¶61 Second, the State argues that tolling is necessary to achieve the statutory purpose of Wisconsin's competency procedure because, for the period during which an order for treatment is stayed, the defendant does not receive the treatment that is designed to bring him or her to competency. It argues that "[i]f a defendant is in custody but not receiving 'appropriate treatment,' the statutory time limits simply do not come into play under the plain language of the statute." We reject this argument because it mischaracterizes the statute. WISCONSIN STAT. § 971.14 does not provide that the State has twelve months to deliver "appropriate treatment," as the State asserts. Rather, it provides that, if the defendant "is likely to become competent within the period specified in this paragraph if provided with appropriate treatment," he or she may be committed "to the custody of the department" for a period not to exceed twelve months. Sec. 971.14(5)(a)1. The statute does not create an exception allowing the court to commit the defendant to custody for longer than twelve months because, during some portion of that time, the defendant is not receiving "appropriate treatment." Although the custody under § 971.14 must be for purposes of treatment, it is the custody, not the treatment, that may not exceed twelve months.[16] This is further demonstrated in other provisions

---

[16] It is not only an automatic stay that may prevent a defendant from receiving treatment during the twelve-month commitment period. As Green correctly notes, he was placed on a lengthy wait list for treatment at Mendota Mental Health; and he would have been unable to receive treatment during the 98 days during which his involuntary medication order was stayed even if there had been no stay. Nothing in the statute indicates that the legislature intended to allow the State to hold defendants in custody for months while they await treatment and then hold them for another twelve months once treatment has begun. Rather, custody itself is limited to twelve months from the date the defendant is committed to the department. WIS. STAT. § 971.14(5)(a)1.

of the statute that refer to the "commitment period" rather than the "treatment period." Sec. 971.14(6); Secs. 971.14(5)(b)-(d).

¶62    As explained, the purpose of WIS. STAT. § 971.14 is to give the State the opportunity to bring a defendant to competency while limiting to no more than twelve months the period in which a defendant may be held without any chance to prove his or her innocence as to the crimes charged.  Tolling the statutory limits, therefore, is not only unnecessary to achieve the statute's purpose but is counter to the statute's purpose.

¶63    For the foregoing reasons, we conclude that the circuit court lacked authority to toll the statutory period to bring a defendant to competency under WIS. STAT. § 971.14.  As noted, the court ordered Green's commitment on February 10, 2020.  Because more than twelve months have elapsed since then, we direct the circuit court to discharge Green from that commitment on remand.[17]

### III.  Motion to Lift Stay in Circuit Court

¶64    Green argues that the circuit court "lacked authority" to hear the State's motion to lift the automatic stay of the involuntary medication order.  We construe Green's argument as addressing whether the circuit court had competency to proceed with hearing the motion that the State filed in that court.  *See Village of Trempealeau v. Mikrut*, 2004 WI 79, ¶¶8-10, 273 Wis. 2d 76, 681 N.W.2d 190 (The circuit court's competency refers to its "ability to exercise the subject matter jurisdiction vested in it" by Article VII, Section 8 of the Wisconsin Constitution).

---

[17] As Green notes, the discharge of Green from commitment under WIS. STAT. § 971.14(5)(a) does not preclude the circuit court from ordering, under § 971.14(6)(b), that Green be taken immediately into custody and delivered to a facility for a commitment under Chapter 51 or Chapter 55.

Whether a court has competency presents a question of law that we review independently. *Mikrut*, 273 Wis. 2d 76, ¶7.

¶65 We first summarize pertinent legal principles to provide context for our analysis of Green's argument. Stays of circuit court orders and relief from such stays are generally governed by WIS. STAT. § 808.07 and WIS. STAT. RULE 809.12. Section 808.07 provides that either a circuit court or an appellate court may stay execution or enforcement of a judgment or order. Sec. 808.07(2)(a)1. However, RULE 809.12 directs that a party seeking a stay under § 808.07 "shall file a motion in the [circuit] court unless it is impractical to seek relief in the [circuit] court." RULE 809.12. Then, once the circuit court has decided the motion, "[a] person aggrieved by an order of the [circuit] court granting the relief requested may file a motion for relief from the order with the court [of appeals]." RULE 809.12.

¶66 Generally, the party seeking the stay must: (1) make a strong showing that it is likely to succeed on the merits of the appeal; (2) show that it will suffer irreparable injury if a stay is not granted; (3) show that no substantial harm will come to other interested parties; and (4) show that a stay will do no harm to the public interest. *State v. Gudenschwager*, 191 Wis. 2d 431, 440, 529 N.W.2d 225 (1995) (interpreting WIS. STAT. § 809.12). That standard was modified by *State v. Scott*, 2018 WI 74, ¶46-47, 382 Wis. 2d 476, 914 N.W.2d 141 for motions regarding orders for involuntary medication.

¶67 Under *Scott*, the party seeking a stay of an involuntary medication order pending appeal is automatically entitled to one, without any burden to prove the *Gudenschwager* factors, and the party seeking to *lift* the automatic stay, after it has been entered, must show that a modified version of the *Gudenschwager* factors has been met. *Scott*, 382 Wis. 2d 476, ¶¶42-47. The party seeking to lift the stay

under *Scott* must show that: (1) it is likely to succeed on the merits on appeal; (2) the defendant will not suffer irreparable harm if the stay is lifted; (3) no substantial harm will come to other interested parties if the stay is lifted; and (4) lifting the stay will do no harm to the public interest. *Id.*, ¶47. Whether to grant the State's motion to lift the automatic stay is a discretionary decision. *Id.*, ¶48.

¶68　Green argues that the circuit court lacked competency to hear the State's motion to lift the automatic stay of the court's involuntary medication order for two reasons, one based on language in *Scott* and one based on language in WIS. STAT. RULE 809.12. We now address each argument in turn.

¶69　We turn first to Green's reliance on *Scott*. In *Scott*, the defendant appealed a circuit court's involuntary medication order and also filed with the court of appeals an emergency motion to stay the order, which the court of appeals denied without explanation. *Scott*, 382 Wis. 2d 476, ¶19. There is no indication that the State filed any motions relating to the stay or motion. *Id.*, ¶¶13-20. The supreme court granted the defendant's petition to bypass and reached four holdings: (1) courts must follow the automatic stay and stay-lifting standard set forth above; (2) an involuntary medication order is a final order for purposes of appeal; (3) the court of appeals erroneously exercised its discretion when it denied without explanation the defendant's motion to stay the involuntary medication order pending appeal; and (4) "[i]nvoluntary medication orders are subject to an automatic stay pending appeal, which can be lifted upon a successful motion by the State." *Id.*, ¶11.

¶70　As to the last ruling, the court stated, "[W]hether to grant the State's motion is a discretionary decision, and as we explained above, the court of appeals must explain its discretionary decision to grant or deny the State's motion." *Id.*,

¶48. It is on this language that Green relies to support his argument that "it is the court of appeals, not the circuit court, that decides the state's motion to lift the automatic stay[.]"

¶71    We reject Green's reliance on *Scott* for the following reasons.  First, *Scott* contains no language specifying in which court a motion to lift the automatic stay in an involuntary medication case must be filed.  Rather, the *Scott* court's directive to the court of appeals followed only from the fact that the defendant filed his motion to stay in the court of appeals, so that in that case any motion by the State to lift the stay would have also been filed in the court of appeals.  Accordingly, it was for the court of appeals to explain its discretionary decision of the motion before it.

¶72    Second, because *Scott* created the rule that the stay must be entered automatically and that it is the State which bears the burden of satisfying a modified *Gudenschwager* test in its motion to lift the stay, no motion to lift such an automatic stay had ever been addressed prior to *Scott*.  Green points to no language in *Scott* either barring the State from filing such a motion to lift an automatic stay in the circuit court or barring the circuit court from hearing such a motion.  We agree with the State that *Scott*'s requirement that the court of appeals explain a discretionary decision regarding a motion before it cannot be read to require that the State must file a motion to lift an automatic stay of an involuntary medication order only with the court of appeals.

¶73    We turn next to Green's reliance on WIS. STAT. RULE 809.12.  Green points to the statutory language providing that "[a] person aggrieved by an order of the trial court granting the relief requested [under WIS. STAT. § 808.07] may file a motion for relief from the order with the court [of appeals]."  RULE 809.12.  Green

explains that the State is aggrieved by the automatic stay and, therefore, it may file a motion to lift the stay in the court of appeals. However, Green points to no language in the statute or elsewhere directing that a party so aggrieved *must* file a motion to lift a stay in the court of appeals rather than in the circuit court. *See Heritage Farms, Inc. v. Markel Ins. Co.*, 2012 WI 26, ¶32, 339 Wis. 2d 125, 810 N.W.2d 465 ("we generally construe the word 'may' as permissive").

¶74 We reject whatever argument Green means to make based on the above-quoted statutory language as both incomplete and raised for the first time on reply. *See Clean Wis., Inc. v. Public Serv. Comm'n of Wis.*, 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments."); *Bilda v. County of Milwaukee*, 2006 WI App 57, ¶20 n.7, 292 Wis. 2d 212, 713 N.W.2d 661 ("It is a well-established rule that we do not consider arguments raised for the first time in a reply brief.").

¶75 In sum, Green fails to point to any authorities indicating that the circuit court lacked competency to hear the State's motion to lift the automatic stay of the circuit court's involuntary medication order.

## CONCLUSION

¶76 For the reasons stated, we conclude that the circuit court properly heard the State's motion to lift the automatic stay of the involuntary medication order. We also conclude that the State failed to show by clear and convincing evidence that the involuntary medication order was substantially likely to render Green competent to stand trial and unlikely to have side effects that would interfere significantly with Green's ability to assist counsel in conducting a trial defense, as required by the second *Sell* factor, or that the order was medically appropriate for Green, as required by the fourth *Sell* factor. Finally, we conclude that the circuit

court erred in tolling the statutory period to bring Green to competency. Consistent with these conclusions, we vacate this court's previous order lifting the automatic stay in denying Green's motion for relief pending appeal, and we reverse and remand for the circuit court to discharge Green from his commitment to the Department of Health Services.

*By the Court.*—Orders reversed and cause remanded with directions.