COURT OF APPEALS
DECISION
DATED AND FILED

September 18, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos. 2022AP924-CR**
**2022AP943-CR**
**2022AP1109-CR**

Cir. Ct. Nos. 2022CM114
2022CM169
2022CF954

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

MARCUS CROSBY,

    DEFENDANT-APPELLANT.

APPEAL from orders of the circuit court for Waukesha County: JENNIFER R. DOROW, Judge. *Affirmed*.

Before Gundrum, P.J., Grogan and Lazar, JJ.

Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).

¶1 PER CURIAM. In this consolidated appeal, Marcus Crosby appeals involuntary medication orders entered in felony and misdemeanor proceedings. He argues the orders were based on constitutionally inadequate evidence and therefore violated his due process rights. We conclude there was sufficient evidence to support the order in the felony matter under the four-part test articulated in *Sell v. United States*, 539 U.S. 166 (2003). We therefore need not decide whether dangerousness in an institutional setting constitutes a separate and independent basis for an involuntary medication order. Additionally, both the mootness doctrine and the harmless error doctrine counsel against addressing the constitutional validity of the misdemeanor order. Accordingly, we affirm.

## BACKGROUND

¶2 The involuntary medication orders at issue in this consolidated appeal relate to three criminal cases. As described more fully below, the first two cases concern misdemeanor offenses that took place in January 2022. The third case, a felony matter, relates to Crosby's alleged conduct in June 2022 while confined in the Waukesha County Jail.

¶3 On January 21, 2022, Crosby was charged with disorderly conduct based on his alleged conduct the prior day at Brookfield Square Mall, where he shouted profanities at guests and refused to leave the premises.

¶4 A few days later, Crosby allegedly violated the conditions of his signature bond when he returned to the mall while it was closed and refused to leave. He was taken into custody, but upon his release he allegedly engaged in loud, disruptive conduct at two other businesses necessitating police intervention. At the second location, Crosby refused requests by the business and by police to

2

leave. Crosby began making erratic movements with his body, and officers feared he was going to strike or fight them. They eventually decided to restrain Crosby, at which time Crosby allegedly continued shouting and began to "violently thrash from side to side and kick his legs." Crosby was ultimately tased and arrested. Based on those events, Crosby was charged with two counts of bail jumping, one count of disorderly conduct, and one count of resisting an officer, all misdemeanors.

¶5 At the probable cause hearing for the first mall incident, the court commissioner ordered a competency evaluation to be completed within thirty days and set the matter for a February 21, 2022 hearing before the circuit court. At the February 21 hearing, the circuit court extended the competency order to the second misdemeanor case. Thereafter, the competency proceedings occurred in tandem for both misdemeanor matters.

¶6 Psychiatrist John Pankiewicz evaluated Crosby at the jail and opined that Crosby lacked substantial capacity to understand court proceedings or assist in his own defense. Pankiewicz noted Crosby's historical diagnoses of "severe and persistent mental illness including Schizophrenia and Schizoaffective disorder," as well as that Crosby was exhibiting behaviors consistent with such diagnoses in the jail, including being "unpredictably aggressive and on occasion scream[ing] for hours." Pankiewicz opined that Crosby could be restored to competency within the statutory time period if treated with medication at an inpatient institution, which he believed was in Crosby's best interests. Pankiewicz believed Crosby would require an involuntary medication order if he was deemed incompetent, as Crosby had refused treatment and had falsely denied he had any mental illness or any history of treatment. Pankiewicz did not identify any proposed medications,

but opined that there were no alternative treatments and the unspecified medications were not likely to have side effects.

¶7 Crosby appeared in person at the competency hearing on June 1, 2022, but he had to be removed from the courtroom after he stated he was hearing voices and became disruptive. Pankiewicz offered testimony consistent with his report. At the conclusion of his testimony, the circuit court asked Pankiewicz whether Crosby was a danger to himself or others. Relying on Pankiewicz's affirmative answer, the court concluded involuntary medication was warranted because Crosby was a danger to others. The court concluded that it likely could not order involuntary medication under the four-part due process test articulated in *Sell*, as the charged offenses were only misdemeanors that did not reflect an "important governmental interest at stake." However, the court understood *Sell* to recognize dangerousness as a separate and independent basis for an involuntary medication order. The involuntary medication order was stayed pending appeal.

¶8 On June 3, 2022, the circuit court held a hearing to clarify its findings related to the involuntary medication. After that hearing, Crosby was returned to the jail and allegedly spat in the face of a jail employee. A new felony case was opened charging Crosby with assault by prisoner and disorderly conduct.

¶9 The circuit court ordered a competency evaluation in the felony matter, which was completed by Dr. Andressa Medrado Dias Silveira, under the supervision of psychologist Thomas DeBoer. Medrado Dias Silveira diagnosed Crosby with schizophrenia and opined that he lacked substantial mental capacity to understand the proceedings and assist in his defense. She concluded Crosby

would likely be restored to competency with treatment, including psychotropic medication, within the statutory period.

¶10    Doctor Michelle Hume submitted an accompanying request for involuntary medication.  Hume prepared an individualized treatment plan that identified possible drugs to be administered and allowed Crosby to pick from among the offered antipsychotic medications.  If Crosby refused to select one, Hume stated she would prescribe risperidone, as Crosby had responded to similar medication in the past.  Hume's report discussed dosage information, delivery method, possible side effects, and monitoring efforts.  Hume's report offered a number of conclusions supporting her overall opinion that involuntary medication was necessary to restore Crosby to competency.

¶11    The circuit court held an evidentiary hearing, at which Medrado Dias Silveira and Hume testified.[1]  During Medrado Dias Silveira's testimony, the court again inquired about Crosby's dangerousness, and Medrado Dias Silveira responded that he seemed "labile and threatening and poses a risk for other people."  Hume likewise offered the opinion that Crosby posed a danger to himself or others based on his aggressive behavior and diagnosis.

¶12    Hume also elaborated upon her report.  Crosby had been successfully treated previously using paliperidone.  If Crosby refused to select a medication, Hume proposed to treat him with risperidone, which metabolizes to paliperidone and is "really the same medication."  Risperidone had the added benefit of being available in a drinkable liquid form, which Hume hoped could

---

[1]  Crosby refused to participate in the hearing.

5

avoid forced medication. Hume discussed three categories of possible side effects to risperidone and noted that if monitoring revealed any serious side effects that affected Crosby's cognition, his treatment plan would be modified accordingly.

¶13 As it did with the misdemeanor cases, the circuit court determined Crosby was not competent to understand the proceedings or assist in his defense but was likely to become competent within the statutory time period. In ordering involuntary medication, the court chronicled Crosby's behavior demonstrating he was in the throes of a psychiatric crisis, including his aggressive and combative conduct. And, once again, the court concluded that Crosby's dangerousness warranted involuntary medication, independently of the four-part *Sell* test.

¶14 Unlike the misdemeanor cases, however, the circuit court concluded the *Sell* test was also satisfied in the felony matter. The more severe charge increased the governmental interest at stake, and the court determined involuntary medication would significantly further the governmental interest in prosecution. The court next found that the treatment plan was appropriate and that the medication was substantially unlikely to have side effects that undermined the fairness of the trial. It also determined involuntary medication was both medically appropriate in light of Crosby's condition and necessary in the sense that there were no alternative, less intrusive treatments likely to achieve substantially the same results.

¶15 Crosby filed a notice of appeal and a motion to stay the involuntary medication order in the felony matter pending appeal. The circuit court denied the motion, and by order we concluded the circuit court did not erroneously exercise its discretion in doing so. The appeals from the involuntary medication orders in

the two misdemeanor cases and in the felony case were consolidated for briefing and disposition by a three-judge panel.

## DISCUSSION

¶16 Crosby brings constitutional challenges to the involuntary medication orders entered in connection with his three cases. We decide de novo whether an involuntary medication order violates a person's constitutional right to due process. ***State v. Silverstein***, 2017 WI App 64, ¶27, 378 Wis. 2d 42, 902 N.W.2d 550. To the extent our review implicates the circuit court's findings of historical fact, we review those findings using the "clearly erroneous" standard.[2] ***Marathon County. v. D.K.***, 2020 WI 8, ¶18, 390 Wis. 2d 50, 937 N.W.2d 901.

¶17 A defendant who is incompetent to stand trial may be, within constitutional boundaries, subjected to an involuntary medication order as part of efforts to restore him or her to competency. ***State v. Fitzgerald***, 2019 WI 69, ¶13, 387 Wis. 2d 384, 929 N.W.2d 165. A restoration-to-competency order under WIS. STAT. § 971.14 (2021-22)[3] may include involuntary medication only when the

---

[2] Having concluded that Wisconsin law adequately sets forth the standard of review on the constitutional issue Crosby raises (and because such review consists of a de novo consideration of the issue, the most favorable standard for Crosby's position), we leave for another day the State's assertion that the court should adopt separate standards of review for each of the ***Sell*** factors, as articulated in ***United States v. Diaz***, 630 F.3d 1314, 1330-31 (11th Cir. 2011). *See* ***State v. Green***, 2021 WI App 18, ¶¶19-20, 396 Wis. 2d 658, 957 N.W.2d 583, *aff'd in part*, 2022 WI 30, 401 Wis. 2d 542, 973 N.W.2d 770 (similarly declining to offer a definitive determination of the standard of review).

[3] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

order complies with the four-factor *Sell* test. *Fitzgerald*, 387 Wis. 2d 384, ¶¶26-29.

¶18    Under *Sell*, to comport with due process, a court desiring to order involuntary medication must find that: (1) there is an important governmental interest at stake; (2) the involuntary medication will significantly further that interest, i.e., the medication will be substantially likely to render the defendant competent to stand trial and unlikely to have side effects that will compromise the assistance he or she can provide with the trial defense; (3) the involuntary medication is necessary to further that interest, in that alternative, less intrusive treatments are unlikely to achieve substantially the same result; and (4) the administration of drugs is medically appropriate, i.e., in the patient's best medical interest. *Fitzgerald*, 387 Wis. 2d 384, ¶¶14-17.

¶19    As it relates to Crosby's felony matter, Crosby challenges only the circuit court's findings on the second and fourth factors. Crosby argues that the second and fourth factors "taken together require a treatment plan tailored to the defendant that provides the 'medically informed record' needed for the court to evaluate whether involuntary medication is constitutional." He argues Hume offered only "non-committal statements regarding medication and dosage" that amounted to only a general—not individualized—treatment plan. Crosby further argues Hume's analysis of risk factors, side effects, and basic health information was lacking.

¶20    We agree with the State that the evidence was sufficient to support the circuit court's findings on the second and fourth *Sell* factors. As an initial matter, Crosby concedes Hume identified Crosby's prior response to treatment, his

known medical illnesses or drug allergies, and the typical side effects of risperidone, which was Hume's preferred medication should Crosby decline to select his own. Hume also expressed a desire for Crosby to take risperidone orally, in an expected dosage ranging from four to eight milligrams, or higher depending on the effectiveness of the drug if some was already in his bloodstream.

¶21 In asserting that the proposed treatment plan fell short of *Sell*, Crosby emphasizes that Hume provided detailed information regarding only one medication, risperidone, and even then discussed only the general side effects of that drug. But the focus on risperidone was a function of Hume's recognition that Crosby had previously been successfully treated with that medication. The other proposed medications were only to be used conditionally: five milligrams of short-acting haloperidol, to be injected if Crosby refused an oral antipsychotic agent, with a maximum of ten milligrams daily; and a long-term injectable version if Crosby continued his refusals even with short-term treatment. Hume did not note that Crosby was particularly likely to suffer from any potential side effects of his preferred drug, and Crosby is unclear as to what more Hume could have done absent such susceptibility beyond identifying some risk of the side effects occurring and create an alternative plan should the need arise—both of which she did.

¶22 Crosby contends the circuit court here did nothing more than "delegate [the court's] responsibility [under *Sell*] to a treating provider," which is prohibited under *State v. Green*, 2021 WI App 18, ¶44, 396 Wis. 2d 658, 957 N.W.2d 583, *aff'd in part*, 2022 WI 30, 401 Wis. 2d 542, 973 N.W.2d 770. Though the quoted language has bite, it is not a contextually appropriate statement of what occurred here. The *Green* court chastised the lower court for its "pro-

9

forma review" of a treatment plan that was not signed by any physician. *Id.*, ¶44. The plan in *Green* consisted of merely "matching a general treatment plan for a condition to the defendant's diagnosed condition," which was insufficient. *Id.*, ¶34. Moreover, the involuntary medication order at issue in *Green* had the sequencing backwards, leaving the medical soundness of the court-ordered involuntary medication as a determination for the treatment providers to make after the competency proceedings were done. *Id.*, ¶44.

¶23 Though due process demands much, Crosby's argument holds the circuit court to an even more rigorous standard than is supported by *Sell*, *Fitzgerald*, and *Green*. Crosby suggests the constitutional validity of the involuntary medication order turns on the treatment plan setting forth exhaustive details about the defendant, such that the omission of a basic fact like the defendant's age or weight could sink an otherwise valid order. Involuntary medication proceedings are necessarily fact-specific and detailed, but the legal granularity Crosby suggests is necessary is not supported by the relevant authorities. More may be required if the defendant has never received medication; less in a case like this, where Crosby has been successfully treated in the recent past. And while a treatment plan should certainly take into account a defendant's basic medical information—which includes, under *Green*, age and weight, illness duration, past responses to psychotropic medications, cognitive abilities, other medications, etc.—in not every case will these need to be extensively chronicled to satisfy due process.

¶24 Having concluded that the evidence was sufficient in the felony matter to satisfy the *Sell* factors, we have no need to also consider Crosby's argument that an individual's dangerousness does not provide a separate basis for

the involuntary administration of medication. *See Turner v. Taylor*, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (observing we need not address all issues raised by the parties if one is dispositive).

¶25 We also need not consider whether the misdemeanor involuntary medication order is constitutionally deficient. The State argues that the issues surrounding the misdemeanor order are moot, since that order (and the concomitant commitment order) has expired. Crosby concedes the orders in the misdemeanor matters have expired, but argues the orders might be resurrected at some future time and have some collateral financial consequences that make the mootness doctrine inapt.

¶26 Both the mootness and the harmless error doctrines counsel against our review. The harmless error doctrine instructs that in every stage of an action, courts shall disregard errors or defects that do not affect the substantial rights of the adverse party. WIS. STAT. § 805.18; *State v. Nieves*, 2017 WI 69, ¶60, 376 Wis. 2d 300, 897 N.W.2d 363. An error affects the substantial rights of a party if there is a reasonable probability of a different outcome absent the error. *Id.*, ¶17. The mootness doctrine applies if the resolution of an issue will have no practical effect on the underlying controversy. *Portage County. v. J.W.K.*, 2019 WI 54, ¶11, 386 Wis. 2d 672, 927 N.W.2d 509. Both harmless error and mootness present questions of law. *Id.*, ¶10; *State v. Jackson*, 2014 WI 4, ¶44, 352 Wis. 2d 249, 841 N.W.2d 791.

¶27 Ascertaining whether there was error associated with the misdemeanor cases would not, as a practical matter, benefit Crosby, and moreover, even if there was error it would not have affected Crosby's substantial

11

rights. The misdemeanor involuntary medication order was stayed almost immediately and has never been enforced. By Crosby's own admission, it is now expired and cannot be enforced in the future. Although Crosby argues he might be liable for the cost of his commitment under WIS. STAT. ch. 46, he does not explain how that liability could extend to the cost of administering involuntary medication under an order that, as a practical matter, has never been active.

¶28 Crosby also emphasizes the "stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment," *Vitek v. Jones*, 445 U.S. 480, 494 (1980), as demonstrating continuing harm if the misdemeanor involuntary medication order is not vacated. But in light of our affirming the felony involuntary medication order, a reversal of the misdemeanor order would not remove any stigmatizing effect. It would be a perfunctory gesture that would not obtain Crosby any meaningful benefit.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.