# COURT OF APPEALS
## DECISION
## DATED AND FILED

## December 27, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2024AP1789-CR**
**2024AP1799-CR**

**Cir. Ct. Nos. 2023CF43**
**2022CF132**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

D. E. C.,

    DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Jackson County: ANNA L. BECKER, Judge. *Dismissed as moot*.

APPEAL from an order of the circuit court for Clark County: ANNA L. BECKER, Judge. *Affirmed*.[1]

---

[1] These appeals were consolidated for briefing and disposition by an order dated September 11, 2024. *See* WIS. STAT. RULE 809.10(3). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

Before Kloppenburg, P.J., Blanchard, and Nashold, JJ.

¶1 BLANCHARD, J. D.E.C. challenges a circuit court order authorizing the Wisconsin Department of Health Services ("the department") to involuntarily medicate D.E.C., consistent with the department's proposed individual treatment plan, for the purpose of restoring him to competency so that he can stand trial in a Clark County criminal case. More specifically, D.E.C. argues that the involuntary medication order violates his right to due process because it fails to meet two factors required under *Sell v. United States*, 539 U.S. 166 (2003): that it is sufficiently individualized so as to significantly further the State's interest in proceeding to trial, and that it is medically appropriate. *See id.* at 180-81. We conclude that the involuntary medication order does not violate D.E.C.'s right to due process. The proposed treatment plan is not unconstitutionally generic and is medically appropriate when it is considered in the context of evidence in the record, which notably includes the testimony of D.E.C.'s treating psychiatrist at an evidentiary hearing. Accordingly, we affirm the involuntary medication order.[2]

## BACKGROUND

¶2 In August 2022, D.E.C. was charged in Clark County with felony offenses. Some challenges to involuntary medication orders call for consideration

---

[2] This is a consolidated appeal challenging a circuit court order entered in both a Clark County criminal case and a Jackson County criminal case. It is undisputed that the circuit court dismissed the Jackson County case on October 2, 2024, and the State argues that this renders moot that aspect of the appeal. D.E.C. does not develop an argument on the mootness topic and in any case does not provide a basis to think that there is anything about the Jackson County case that requires separate attention in this opinion. Accordingly, we dismiss the Jackson County case portion of this appeal as moot and do not address it further.

of the nature of the criminal charge or charges pending against the defendant. *See, e.g., State v. J.D.B.*, 2024 WI App 61, ¶¶35-53, ___ Wis. 2d ___, 13 N.W.3d 525 (analyzing whether the State had an important interest in the prosecution, the first factor under *Sell*). But not in this appeal. As discussed below, the parties limit their arguments to issues that do not depend on the nature of the charges against D.E.C. The dispute is whether the medications and dosages listed in the individual treatment plan, as placed in context by the testimony of D.E.C.'s treating psychiatrist during a circuit court evidentiary hearing, meet two *Sell* factors.

¶3 D.E.C. was initially evaluated by mental health professionals in January 2023 while he was being held in the Jackson County Jail. In September 2023, counsel for D.E.C. filed a letter with the circuit court questioning D.E.C.'s competency to assist in his defense. In November 2023, D.E.C. was examined for competency. He was diagnosed with schizophrenia and untreated symptoms that rendered him incompetent to proceed to trial. On December 20, 2023, the court ordered D.E.C. committed for treatment pursuant to WIS. STAT. § 971.14(5), based on a finding that D.E.C. was incompetent to assist in his defense. He was re-examined in March 2024 in the jail, while awaiting transfer to the Wisconsin Resource Center, in Winnebago, Wisconsin, with the transfer occurring on July 1, 2024.

¶4 In a July 8, 2024 report, a clinical psychologist stated that D.E.C. "remained unmedicated and psychotic" and was "confused, disorganized, and delusional at baseline." This psychologist concluded that D.E.C. "continues to lack substantial mental capacity to understand the pending proceedings meaningfully to assist in his defense," and "is likely to be restored to competency within the permissible timeframe," if "provided psychiatric treatment" in the Wisconsin Resource Center.

¶5    On July 19, 2024, the department filed a motion asking the circuit court to approve an involuntary medication order to treat D.E.C. to competency, consistent with an "individual treatment plan" completed by two psychiatrists, Dr. Marley Kercher and Dr. Benjamin Title.  *See* WIS. STAT. § 971.14(5)(am) (describing circumstances under which the department may move for a hearing for the court to determine whether a defendant is not competent to refuse needed medication or treatment, accompanied by a supporting expert examiner); § 971.14(3)(dm) (describing necessary elements of the examiner's report).

¶6    The treatment plan submitted by the psychiatrists has two major sections, with the second section generating the issues in this appeal.  For context, we note that the first section summarizes the psychiatrists' sources of information, provides mental health diagnoses of D.E.C., describes unsuccessful efforts to provide treatment voluntarily, and briefly asserts why they concluded that involuntary administration of medication is needed.

¶7    The second section of the treatment plan is titled, in bolded capitalized letters, "Medication Treatment to Be Provided."  Immediately below is this sentence:  "The following oral medications are proposed for treatment either in combination or in succession to restore the defendant's competency to stand trial."  Next comes a grid that lists six medications, each to be provided for "[t]reatment of symptoms of psychosis" and each stating a dosage range.[3]  We generally refer to this as "the oral medications grid."

---

[3] The oral medications grid lists the following, with dosage ranges stated in milligrams per 24-hour period, to be administered in amounts less than or equal to the specified number of milligrams:  aripiprazole (up to 30 mg); risperidone (up to 8 mg); paliperidone (up to 12 mg); olanzapine (up to 20 mg); haloperidol (up to 30 mg); and fluphenazine (up to 40 mg).

¶8      Below the oral medications grid, the treatment plan states: "The following medications are proposed to be given by injection if the defendant is unable or unwilling to take the proposed medication." Following this is a second grid listing four injectable medications, each to "[t]reat symptoms of psychosis," with dosage ranges for each.[4] We generally refer to this as "the injectable medications grid."

¶9      Below the injectable medications grid are explanatory notes. These include the following:

- "Treatment will be provided by a physician."

- "The defendant may consent to treatment with alternative medications in lieu of or in addition to involuntary medication when such treatment is medically appropriate."

- "Progress reports" regarding the "effects of treatment and progress toward competency restoration" will be provided to the circuit court on the schedule established in WIS. STAT. § 971.14(5)(b) for required periodic reexaminations.

- "Additional medications to address side effects or allergic reactions will be provided when necessary."

¶10     This last note relates to a third grid, which concludes the treatment plan and which we generally refer to as "the additional medications." The

---

[4] The injectable medications grid lists the following, with amounts stated in terms of ranges: aripiprazole LAI (Maintena) (300-400 mg every 4 weeks); paliperidone LAI (Invega) (78-234 mg every 4 weeks); haloperidol decanoate (100-400 mg every 4 weeks); and fluphenazine LAI (12.5-100 mg every 2-3 weeks).

Dr. Kercher made clear in her testimony at the hearing that the four medications listed in the injectable medications grid with names that match four of the medications in the oral medications grid are in fact injectable formulations of the same medications. This has not been disputed at any point by D.E.C.

additional medications are introduced with the following sentence: "Additional names of Medication for [D.E.C.]" This grid reflects the following:

● Three medications to be injected (Haldol, up to 10 milligrams; ziprasidone, up to 20 milligrams; and olanzapine, up to 5 milligrams) as "back up" in the event that D.E.C. refused an oral dose of one or more unspecified medications.[5]

● One medication to be given orally (Cogentin, up to 4 milligrams within 24 hours) in the event of extrapyramidal symptoms, that is, involuntary movements caused by medications.[6]

● Two medications (hydroxyzine, oral dose, up to 400 milligrams within 24 hours; diphenhydramine, oral dose, up to 150 milligrams within 24 hours) in the event of extrapyramidal symptoms, anxiety, or insomnia.

● Any of three benzodiazepine medications (lorazepam, clonazepam, or diazepam) in the event of agitation, severe anxiety, or insomnia, at up to 10 milligrams within 24 hours, orally, but injected "if available and indicated based on response and within standard of care by peers."

● One medication (propranolol, up to 80 milligrams within 24 hours, orally) in the event D.E.C. experiences akathisia.[7]

¶11 On its face, this means that each of the eight types of additional medications is to be administered, at or under the maximum stated dose level, as necessary to resolve an identified circumstance or complication (*e.g.*, refusal to take an oral medication, or insomnia).

---

[5] A suggestion was made at the hearing by defense counsel, not contradicted by anyone, that injectable Haldol, included in the additional medications, is the same as haloperidol decanoate, which is listed in the injectable medications grid.

[6] Only the acronym "EPS" appears in this entry, but D.E.C. provides support on appeal for the definition of "EPS" that we provide in the text.

[7] D.E.C. provides support on appeal for the assertion that "propranolol is another 'EPS' medication, [because] 'akathisia' is itself an extrapyramidal symptom."

¶12    On July 26, 2024, the circuit court held a hearing on the department's motion. The only witness was Dr. Kercher, the medical director of the Wisconsin Resource Center.[8]  She identified herself as D.E.C.'s treating psychiatrist.

¶13    At the time of the hearing, and continuing on appeal, D.E.C. did not dispute any of the following points made by Dr. Kercher in her testimony, with each of these points being credited or implicitly credited by the circuit court. Based on relevant records and personal assessments of D.E.C., Dr. Kercher diagnosed him as having schizophrenia. She observed that he:  had expressed paranoia; was "very disorganized," "withdrawn," "unstable;" and displayed various "grim or disruptive behaviors."  Dr. Kercher's interactions with D.E.C. convinced her that he did not understand attempts by doctors to explain to him the value to his well-being of taking antipsychotic medications, with the result that he could not make an informed decision about whether to take them voluntarily. Further, D.E.C. was not able to participate in efforts to restore him to competency without the administration of medication. The Wisconsin Resource Center staff had attempted "psychoeducational" methods with D.E.C. that were less intrusive than involuntary medication, but given D.E.C.'s "untreated underlying mental illness symptoms, he simply isn't able to participate or engage in those."  Dr. Kercher further testified, to a reasonable degree of medical certainty, that D.E.C.'s "symptoms would be best treated with a trial of antipsychotic

---

[8] Dr. Kercher testified that the other signatory on the treatment plan, Dr. Title, also had professional interactions with D.E.C. while working as a senior psychiatry resident under Dr. Kercher's supervision.  But Dr. Title did not testify at the hearing or submit any separate information to the court.

7

medications" and that this would be in his medical interests, even if the administration needed to take place without his consent.

¶14    On 16 occasions, D.E.C. had been offered the opportunity to voluntarily take one "very common" antipsychotic medication—aripiprazole, the oral formulation of which is listed in the oral medications grid and the injectable formulation of which is listed in the injectable medications grid. *See supra* notes 3-4. But he accepted only one dose.

¶15    D.E.C. also does not dispute that he was "antipsychotic naïve," which Dr. Kercher explained means that there was no documented history of his being treated with antipsychotic medications in the past and that his schizophrenia appeared to be a "newly emergent psychotic process."

¶16    We now turn to testimony related to the specific contents of the treatment plan proposed by the two psychiatrists and explained by Dr. Kercher.

¶17    Dr. Kercher testified that implementation of this plan by the doctors she works with would "dramatically improve [D.E.C.'s] thought process," "allow him to be less paranoid," and "allow him to be less isolative and more able and willing and comfortable to engage with others on his treatment teams to participate … in the competency restoration process." "[T]here is a very high likelihood" that application of the treatment plan would render him competent and allow him to assist his attorney with his criminal defense, as well as being in his overall medical interests. Dr. Kercher opined that the benefits to D.E.C. of the medications to be provided under the treatment plan would outweigh any potential side effects.

¶18    As to the specifics of the medications listed in the treatment plan, Dr. Kercher testified that they included both "first-generation" antipsychotics and

8

"second-generation" antipsychotics. She distinguished between the typical effects experienced by patients from the two categories. "Typically," for someone who is antipsychotic naïve, "modern standard practices" call for starting a patient who is new to antipsychotics on a second-generation version, in part because adverse side effects tend to be "less likely" with them than with the first-generation antipsychotics.

¶19 As an example of a second-generation antipsychotic, Dr. Kercher cited aripiprazole, the medication referenced above as having been offered to D.E.C. and refused by him except in one instance and which is listed twice in the treatment plan. She expressed the view that D.E.C. should be started on a medication listed in the oral medications grid (such as aripiprazole, or perhaps paliperidone, if that were better tolerated or more effective), and then, if the effects of that oral medication were positive, move him to an injectable formulation of the same medication. This is because the "standard recommended practice" for treatment of an antipsychotic-naïve patient would be to start him on a second-generation medication (which she identified as aripiprazole, risperidone, paliperidone, and olanzapine) as opposed to a first-generation medication (haloperidol and fluphenazine). At one point she refined her testimony on these topics to say that she would not recommend for him an initial trial of any medication other than aripiprazole.

¶20 Dr. Kercher testified that two rationales call for eventually moving patients to an injectable, long-acting formulation over continuing with an initially tried oral formulation. One rationale is that the "relapse rate" (defined as the rate of hospital readmission for those on outpatient status) is lower for injectable formulations. The other rationale is that there tend to be fewer "peaks and troughs" for patients on injectables, which is better because the goal is to help

patients achieve a "steady-state." But Dr. Kercher rejected defense counsel's suggestion in his questioning that the oral formulation of paliperidone should be removed from the treatment plan in favor of the injectable formulation based on these long-term advantages. This is because medical professionals "always … need" to start a patient on the oral formulation of a medication before administering the injectable formulation, in order "to assess efficacy and tolerability" of the medication.

¶21 Defense counsel asked Dr. Kercher if she thought that the proposed treatment plan should be edited to drop first-generation medications haloperidol and fluphenazine from the oral medications grid, because second-generation versions are generally preferred. At first she responded, "I don't have a problem with doing that." But she proceeded to qualify that answer, based on the observation that some patients have "drug-specific side effects that are idiosyncratic"—such as the "rare" side effect of a drop in the white blood cell count. Because of that, she testified, it would be appropriate to give treatment providers the ability to "more readily" move from a second-generation psychotic to a first-generation one. Later in her testimony, she elaborated on this point. She testified that D.E.C. might have an "idiosyncratic" negative reaction to second-generation medications and, in that case, it "would be considered reasonable and advisable to consider going directly to another medication, like haloperidol, in another class." She also clarified that haloperidol and fluphenazine "are not [medications] that would be the first go-tos," but that she did not think it made sense to eliminate those as possibilities.

¶22 Defense counsel expressed the view that the proposed treatment plan appeared to permit "all six" of the medications in the oral medications grid to be administered "right now." Dr. Kercher agreed that this could be a literal

interpretation of the treatment plan if taken out of proper context, but she made clear that this would not be the approach taken by the doctors here.

¶23 Taking a step back, Dr. Kercher testified that the degree of specificity that psychiatrists use in drafting proposed treatment plans presents a "conundrum," because they want to address "complete" options, but at the same time they want to avoid indicating that all medications could or would be administered "all at once." She testified that she had received "feedback from various courts regarding the appropriateness of being very inclusive versus being very restrictive[,] in case we need to switch from one medication to another. We oftentimes don't have that flexibility if we don't include more medications in the treatment plan."

¶24 Defense counsel asked about the recommended dosage ranges in the treatment plan, starting with aripiprazole at up to 30 milligrams within a 24-hour period. Counsel asserted that public guidance from the U.S. Food and Drug Administration ("FDA") states that dosages of this medication "higher than 10 to 15 milligrams are not generally any more effective" than staying within that range. In responding, Dr. Kercher appeared to confirm her understanding that there is FDA guidance to this effect, and added, "I wouldn't start higher than [10-15 milligrams] right off the bat." But she further testified that it could be appropriate to increase the dosage of aripiprazole for D.E.C. "to what is considered the maximum recommended dosage before abandoning" a trial in the event that there were "no side effects noted, but there appears to be still suboptimal response" in terms of efficacy.

¶25 Along similar lines, defense counsel asserted that separate FDA guidance states that when dosages of olanzapine—which is included in the

treatment plan at up to 20 milligrams per day—are greater than 10 milligrams a day, they are not "shown to be any more effective" than at the 10-milligrams level. Dr. Kercher's answers were similar here. She did not challenge counsel's assertion about the existence of such guidance from the FDA, but she suggested that she disagreed with it. She testified that the maximum of 20 milligrams per day was included in the treatment plan based on the drug manufacturer's "recommended maximal dosage range," because in "many instances" patients "respond … favorably and tolerably to dosages up to" the manufacturer's maximum. She added,

> [B]ut at this point, … I wouldn't go immediately to that dose because I don't see anything in [D.E.C.'s] presentation that would warrant that, and we always start with the lowest possible dose and work upwards to, again, achieve a balance of efficacy and tolerability.

¶26 Defense counsel asked whether it would be "safer" for D.E.C. "to have a treatment plan adopted by the Court today that contemplates the safer range versus … these maximum potentials that are out there?" Dr. Kercher disagreed, on the ground that "these dosage ranges are still considered safe according to the manufacturer's guidelines." She added that doctors administering medications to D.E.C. would be "obviously medically and ethically obliged to" use "good clinical judgment and not us[e] more [medication] than is deemed necessary." At the same time, she testified, "it's standard practice" to give each patient "a robust trial" on a particular medication "before moving onto another medication that may or may not be more effective and may potentially be more … morbid." By "more morbid," she presumably meant more likely to cause severe side effects or complications.

¶27 Defense counsel asked whether it is true that there has been no "safety testing performed as to doses" of fluphenazine "as high as what's being recommended," 40 milligrams within a 24-hour period. Dr. Kercher indicated that she was not aware of "specific literature" to that effect. She testified that "we use" "Stahl's," a publication that gives "maximum dosage range[s]."[9] Counsel asked, "[W]hat [are] the dosages for fluphenazine at which a therapeutic effect is usually achieved?" Dr. Kercher responded:

> In my experience, it can be up to 20 milligrams.… I've rarely used dosage[s] beyond that. That's typically more, again, in individuals who have been treatment resistant to other medications and have required a longer term of treatment. You start … very low and just work up as needed.

¶28 After the close of evidence, the prosecutor argued that the State had carried its burden of showing that an order of involuntary medication, consistent with the proposed treatment plan, would be appropriate. As part of that argument, the prosecutor contended that "it's important to allow the department flexibility in providing a specialized treatment plan" for D.E.C., and that it would not be "appropriate for courts to micromanage" how mental health professionals treat their patients.

¶29 Defense counsel argued that there was a mismatch between what he characterized as the "complete latitude" allowed to the department under the submitted treatment plan and what Dr. Kercher testified would be the actual

---

[9] No one asked Dr. Kercher to elaborate on the reference to "Stahl's" at the hearing, but D.E.C. states on appeal that this was likely a reference to Stephen M. Stahl, STAHL'S ESSENTIAL PSYCHOPHARMACOLOGY PRESCRIBER'S GUIDE (Meghan M. Grady, 8th ed. 2024), and the State does not take a contrary position.

appropriate treatment for D.E.C., in light of the fact that Dr. Kercher "is not the only clinician who is going to be dealing with" D.E.C.

¶30 In addition to making that broad point, defense counsel made the following two specific requests in the alternative: (1) for an order that the treatment plan be limited to the exclusive administration of aripiprazole, on the ground that, according to counsel, it was "the only" medication that Dr. Kercher testified "that she wanted and needs [to administer] right now"; or (2) for an order that the treatment plan be limited to only the second-generation antipsychotics, eliminating all first-generation antipsychotics.

¶31 The circuit court ordered involuntary medication, consistent with the proposed treatment plan, rejecting all of D.E.C.'s arguments. The court relied on Dr. Kercher's testimony that, as the court put it, Dr. Kercher and her colleagues are "planning to start" the application of the treatment plan by administering to D.E.C. only aripiprazole, "at the lowest dose appropriate to address the symptoms that would cause the least amount of side effects," and move up in dosage and then on to other alternatives only as doctors determined the balance of efficacy and tolerability permitted. The court stated that the fact that the treatment plan identifies additional medications is "to [D.E.C.'s] benefit rather than to his detriment because it gives the doctor an opportunity to immediately change [to a different] medication if [the first] could be harmful." D.E.C. appeals.[10]

---

[10] On September 5, 2024, this court granted D.E.C.'s motion to continue an automatic stay of the challenged circuit court order pending our disposition of this appeal. Putting to one side the specific issue of mootness raised by dismissal of the Jackson County case, *see supra* footnote 2, neither side has suggested in briefing or by motion to this court that this appeal is moot, and we do not address this topic further.

**DISCUSSION**

¶32    Before a circuit court may approve a plan to forcibly medicate an accused person to attempt to restore the person's competency to stand trial in a criminal case, the State must prove all of the following:  (1) the State has an important interest in proceeding to trial; (2) involuntary medication will significantly further that State interest; (3) involuntary medication is necessary to further that State interest; and (4) involuntary medication is medically appropriate. *Sell*, 539 U.S. at 180-81 (interpreting the Fifth Amendment Due Process Clause, applicable to the State under the Fourteenth Amendment).  The State must "prove the factual components of each of the four factors by clear and convincing evidence."  *State v. Green*, 2021 WI App 18, ¶16, 396 Wis. 2d 658, 957 N.W.2d 583, *aff'd in part*, 2022 WI 30, 401 Wis. 2d 542, 973 N.W.2d 770.

¶33    In this appeal, D.E.C. does not challenge the State's ability to prove the first and third *Sell* factors.  He argues that the State did not meet its burden on the second and fourth factors, namely, to prove that involuntary medication consistent with the treatment plan will significantly further the State's interest or that it is medically appropriate.

¶34    Regarding the individual treatment plan that accompanies a request for an order of involuntary medication, which is the focus of this appeal, this court has explained the following basic principles.  Submission of such a plan to the court is a necessary step "to fulfilling the second, third, and fourth *Sell* requirements."  *Green*, 396 Wis. 2d 658, ¶37.  Further, we adopted an approach reflected in federal appellate court opinions interpreting *Sell*, under which, "'[a]t a minimum,'" such a plan must identify:

15

> "(1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court...."

*Green*, 396 Wis. 2d 658, ¶38 (quoting *United States v. Chavez*, 734 F.3d 1247, 1253 (10th Cir. 2013), which in turn quoted *United States v. Hernandez-Vasquez*, 513 F.3d 908, 916-17 (9th Cir. 2008)).

¶35 Turning to our standard of review, Wisconsin law is not settled. *See id.*, ¶18; *J.D.B.*, 2024 WI App 61, ¶¶33-34 (noting that the majority of federal courts review *Sell* factors two, three, and four as fact questions subject to clearly erroneous review). The parties in this appeal disagree about whether it is a clearly erroneous standard or a de novo standard. As we did in *Green* and *J.D.B.*, here we do not resolve the applicable standard of review, because we would reach the same conclusion on both factors two and four regardless of which of standard of review we apply. *See Green*, 396 Wis. 2d 658, ¶20; *J.D.B.*, 2024 WI App 61, ¶34. We conclude that the circuit court did not clearly err in making any pertinent finding and that, on our independent review, the court did not err in ordering involuntary medication consistent with the treatment plan.

¶36 We address D.E.C.'s two primary arguments in turn.[11]

---

[11] D.E.C. also briefly suggests as an alternative ground for reversal that the duration of the involuntary medication ordered here is not sufficiently established in the individual treatment plan because, as summarized above, what the plan calls "progress reports" are tied to the requirement of periodic reexaminations in WIS. STAT. § 971.14(5)(b), which the department is required to conduct at established intervals. The treatment plan states in pertinent part:

(continued)

16

## I. *Sell* Factor Two: Failure to Show That Involuntary Medication Consistent with the Plan Would Significantly Further the State's Interest and Be Substantially Unlikely to Have Interfering Side Effects

¶37 Stated more fully, factor two of the *Sell* test requires the State to present sufficient proof that "involuntary medication will *significantly further*" the State's interests in trying the defendant because "administration of the drugs is substantially likely to render the defendant competent to stand trial." *Sell*, 539 U.S. at 181 (emphasis in original). Further, the State must prove that "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.*

¶38 There is no reasonable dispute here that two of the three minimum requirements for treatment plans stated in *Green* have been met. *See Green*, 396 Wis. 2d 658, ¶38. The maximum dosages of all listed medications (including the time periods for administration of each dose) are given in the treatment plan, and it

> The effects of treatment and progress towards competency restoration will be reported to the court as statutorily required at 3 months after commitment, 6 months after commitment, 9 months after commitment and within 30 days prior to the expiration of commitment. Progress reports will be provided earlier should treatment be successful prior to the statutorily required timeframe.

Putting aside the fact that D.E.C. did not raise this issue in the circuit court, he now fails to present a developed argument, and we reject it on that ground. *See State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) (this court need not review issues that are inadequately briefed). Among other problems, D.E.C. fails to explain one of his major premises, which is that department examiners providing the periodic reviews of the ability of the defendant to be restored to competency as required under § 971.14(5)(b) would fail to provide the circuit court with a summary of the defendant's recent medication history and responses to medications.

17

also states the length of time that involuntary treatment of D.E.C. may continue before the department is required to report back to the court. *See supra* note 11.

¶39    Part of D.E.C.'s argument is to the effect that the treatment plan does not meet the third minimum requirement of stating "'the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant,'" *see Green*, 396 Wis. 2d 658, ¶38 (quoted source omitted), because numerous medications are listed and the plan does not guarantee which particular medications will in fact be administered and in what sequence. D.E.C. acknowledges that Dr. Kercher testified about how the plan would be implemented, but he argues in part that the circuit court order is nonetheless unconstitutional because the circuit court failed to "incorporate any restrictions from [Dr. Kercher's] testimony into its order." We disagree that D.E.C. has identified any "incorporat[ion]" or amendment to the order or the treatment plan that is required under *Sell*.

¶40    We conclude that D.E.C.'s argument fails to account for five significant considerations reflected in Dr. Kercher's testimony. This testimony provided valuable context for the circuit court's consideration of the order, which is to be implemented by doctors consistent with the treatment plan.

¶41    The first important consideration is that Dr. Kercher testified that the proposed treatment plan was based on multiple assessments of D.E.C. that she personally made and that were made by a senior resident psychiatrist under her supervision and a review of all available relevant records related to D.E.C. These facts differ sharply from those in *Green* and in *J.D.B.*, and there are no analogs here to the significant lapses by the department noted in *Green* and *J.D.B.*

18

¶42 In *Green*, the State failed to meet its evidentiary burden "because it failed to present an individual treatment plan based on a medically informed record." *Green*, 396 Wis. 2d 658, ¶2. The circuit court in *Green* engaged in a mere "pro-forma" review based on testimony of a psychiatrist who gave only conditional support for a treatment plan that was signed by a prosecutor and not by any physician. *Id.*, ¶¶3, 22, 26, 44. Moreover, the psychiatrist's "opinion was not based on a review of Green's medical history or treatment records," and the psychiatrist "had not evaluated Green for the purpose of prescribing medication for him." *Id.*, ¶32. The result was a merely "generic treatment plan with a medication and dosage that are generally effective for a defendant's condition." *Id.*, ¶34. When asked whether the medication stated in the plan was substantially likely to render Green competent to stand trial, the psychiatrist merely testified that "on paper" it "would be an appropriate treatment," but that given varying individual responses to particular medications, "there's not a single antipsychotic medication that is universally effective." *Id.*, ¶26. The psychiatrist suggested that it would be treatment providers at the department's facility who would be deciding whether to proceed with the treatment plan proposed by the State, or a different treatment plan, "based on information from Green's medical records" that were reviewed by this psychiatrist. *Id.* In sum, the department got it backwards in *Green*. Instead of presenting to the circuit court, and explaining, a treatment plan that had been tailored to this purpose for the defendant, the department asked the court to entirely delegate to the department what medications would be effective and not harmful based on information that the testifying witness had not reviewed. *See id.*, ¶44.

¶43 Here, in contrast, we have "a medically informed record." *See Green*, 396 Wis. 2d 658, ¶2. Dr. Kercher provided testimony to the circuit court

19

outlining an approach that she represented was tailored to D.E.C.'s individual situation, consistent with the specifics stated in the plan. She also described how the listed medications would be trialed with D.E.C. This included clarifying testimony, both on direct and cross examination, regarding the overall goal, consistent with the second *Sell* factor, to balance efficacy and tolerability. This testimony expanded on the plan's listing of the medications in three separate grids, with some language explaining how the grids are interrelated.

¶44 In *J.D.B.*, the treatment plan was "not adequately individualized," because "the record … [was] wanting in many critical respects." *J.D.B.*, 2024 WI App 61, ¶61. The testifying physician was so obviously inattentive that he overlooked "significant" medical history that in part involved medication that had been administered to the defendant to prevent seizures resulting from a head injury. *Id.*, ¶¶9-11, 13, 60. There is no such evidence here.

¶45 The second important consideration here is that, as Dr. Kercher explained in her testimony, D.E.C. was antipsychotic naïve, that is, he lacked a medical history of prior antipsychotic medication experience. When someone lacks such a history, treatment providers may have a head start in zeroing in on one or more antipsychotics (and perhaps also zeroing in on specific dosages) that might be effective for a patient and not cause significant side effects. In contrast, Dr. Kercher explained, the odds are higher with an antipsychotic naïve patient that treatment providers will need to try, and reject, a series of medications before identifying one that is most appropriate. And, given the absence of a medical history for D.E.C. on antipsychotics, the ranges for D.E.C.'s medications might logically need to be relatively larger than the ranges should be for someone with a track record of dosages on one or more identified medications.

¶46 This is a reasonable explanation for including multiple medications with relatively large dosage ranges as alternatives; the department was not limited to including in the treatment plan only the medications that Dr. Kercher described as "first go-tos" with narrow dosage ranges. In *J.D.B.*, it was problematic that there was "a veritable suite of potential medications" in the treatment plan, even though the circuit court was provided with "no evidence" regarding either the specification of a sequence for their administration or the reason or reasons that no sequence could be specified. *See J.D.B.*, 2024 WI App 61, ¶58. Similarly, in *Green* there was insufficient concrete evidence provided to help the circuit court understand how a facially "generic" treatment satisfied *Sell*. *See Green*, 396 Wis. 2d 658, ¶34. In contrast here, a reasonable explanation was provided.

¶47 The third important consideration is that Dr. Kercher testified that "we always start with the lowest possible dose and work upwards" in dosage. She then gave an example, for aripiprazole, that a "lowest possible dose" might be "10 to 15 milligrams." This testimony gave a context to the dosage ranges and time periods for dosages reflected in the treatment plan, and D.E.C. did not provide the circuit court with a good reason to question whether the treatment plan would be safely administered. Further, Dr. Kercher specifically described an intention to first administer aripiprazole to D.E.C. at a low dosage, beginning with the oral formulation, and if that were successful, to not move to any of the other medications. Therefore, aside from aripiprazole (or perhaps paliperidone, she explained, if that were better tolerated or more effective), the other listed medications were presented conditionally, in the sense that they were to be administered as dictated by what Dr. Kercher testified would be "a balance of efficacy and tolerability" within the dosages specified in the plan. In contrast, in *J.D.B.*, while the treatment plan stated maximum dosages, "there is no evidence or

21

indication that there is a maximum amount of a particular medication that can be administered in a given period of time," such as per day or per month. *See **J.D.B.***, 2024 WI App 61, ¶¶18, 56-57.

¶48 The fourth important consideration is also on the dosage topic. Dr. Kercher explained that the ranges listed in the treatment plan—at least some of which reach manufacturer recommended maximums, which she testified she believed to be generally safe guidelines—were established based in part on the following principle:  it is preferable to give a patient "a robust trial" on a particular medication "before moving onto another medication that may or may not be more effective and may potentially be more" dangerous.

¶49 The fifth important consideration is that Dr. Kercher provided illuminating distinctions between first-generation and second-generation antipsychotics and also between antipsychotics that are to be administered orally and those by injection.  These broad points provided the circuit court with context to understand how the medical doctors who will administer the medication or medications—the treatment plan states that "[t]reatment will be provided by a physician"—would reasonably interpret the three grids listing medications to fit D.E.C.'s circumstances.

¶50 These five considerations together persuade us that the circuit court did not commit error in approving involuntary medication, consistent with the treatment plan, because it will significantly further the State's interest in proceeding to a trial at which D.E.C. could adequately assist counsel.  It is true that the treatment plan provides a relatively broad degree of flexibility to the treating doctors, depending on D.E.C.'s reactions to various medications and dosage levels.  But Dr. Kercher provided reasons for this and D.E.C. is incorrect in

arguing that it reflects "no meaningful limitation" on the types and amounts of medications that may be administered, when considered in light of the testimony credited by the circuit court.

¶51    Taking at least some of D.E.C.'s arguments to their logical conclusions, he argues in effect that his involuntary medication consistent with the treatment plan violates his due process rights because the order or the plan does not contain something resembling an exhaustively annotated flowchart with the goal of explicitly excluding authorization for each possible outcome that is incompatible with restoring competency or that risks harsh side effects. Such a hypothetical flowchart would begin with a single medication at a narrow range of dosages, and then trace through each possible subsequent medication and narrow dosage range, explaining step-by-step all permissible medications and the specific anticipated effectiveness and side effects that might be experienced. Or, as a functional alternative, imagine a long list of protocols and procedures that would strictly account for the only allowable sequences of medications and dosages, explaining in detail the risks and benefits of each possible alternative treatment route. Assuming that such an annotated flowchart or list is ever used in the medical world as a feasible treatment plan, D.E.C. fails to identify authority that such a precise, granular prediction of the alternative sequences of events was

necessary, and we do not discern this requirement in *Sell*.[12]  Instead, the State must show the "substantial likelihood" that the plan will result in successful treatment based on "evidence specific to the individual," which does not require a listing of each and every medical consideration or procedure that a testifying psychiatrist may testify about.  *See Green*, 396 Wis. 2d 658, ¶33.

¶52    We also understand D.E.C. to more narrowly, and more reasonably, contend that the treatment plan was deficient to the extent that it failed to explicitly capture some of the broader principles that Dr. Kercher addressed in her testimony which would more readily allow the plan to be interpreted by doctors consistently with the *Sell* factors.  In particular, D.E.C. highlights two applications of the plan that he argues would be facially authorized, and that would lower the likelihood that the State could bring D.E.C. to competence or would create a substantial risk of serious side effects:  the use of any combination of the listed medications without meaningful limitation; and more specifically, the use of injectable medication without first attempting to stabilize D.E.C. on an oral counterpart.

---

[12] This is not to say that an involuntary treatment order cannot violate *Sell* on the ground that the submitted individual treatment plan is defectively non-specific, even if there is some supporting evidence presented by a psychiatrist at a hearing.  The department would be well advised to include significant details in its plans to provide clarity for everyone involved, including to assist circuit courts in the task of applying the standards under *Sell*.  For example, as we established in *Green*, at a minimum each plan must state "(1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court."  *Green*, 396 Wis. 2d 658, ¶38.

But we do not interpret *Sell* or case law applying it to generally require that orders or treatment plans be amended to reflect any and all of the specific standards or protocols that testifying doctors may reference at evidentiary hearings.  And, as we explain in the text, here we conclude that the treatment plan, considered in the context of a record that includes Dr. Kercher's testimony, has a sufficient level of detail.

¶53    As for the reference in the treatment plan to combinations of medications, there was no suggestion in Dr. Kercher's testimony that the treatment plan could be reasonably interpreted by doctors at the Wisconsin Resource Center to call for the improper administration of multiple medications at the same time. Dr. Kercher repeatedly spoke in terms of administration of a single medication, and defense counsel never asked about whether administration of more than one medication at one time was contemplated. Further, Dr. Kercher conveyed the idea, which is consistent with a reasonable interpretation of the face of the treatment plan, that doctors would follow the plan to allow for the minimum dosages (within the ranges and time periods specified in the plan) to produce effective and safe outcomes, focusing on one medication at time.

¶54    One aspect of the plan addresses D.E.C.'s more specific concern with the use of injectable medications without having first stabilized him using an oral medication. The plan specifies that any or all of the four injectable antipsychotic medications could be administered only if D.E.C. is "unable or unwilling to take" one of the listed oral antipsychotic medications. The circuit court had a sufficient evidentiary basis to conclude that, through administration as needed of various medications, doctors would execute the plan in way that would significantly further the State's interests in proceeding to a criminal trial because D.E.C. would be substantially likely to become competent to stand trial, and that doing so would be substantially unlikely to have side effects that will interfere significantly with his ability to assist counsel.

¶55    It is true that some of Dr. Kercher's testimony was framed in terms of what she personally would do as D.E.C.'s treating psychiatrist or of what she would "recommend" that others do. It would have made a better record if the prosecutor had asked her to clarify these references. But the most reasonable

25

interpretation of her testimony, and the way it appears to have been understood and credited by the circuit court, was the following. Dr. Kercher was providing contextual testimony as to how the treatment plan would be reasonably understood by the medical doctors responsible for following it in an ethical manner. For these reasons, we reject D.E.C.'s suggestion that the circuit court operated from the inaccurate premise that the order did not need to be amended to address any of the considerations testified to by Dr. Kercher based on either of two erroneous assumptions that the court might have made. The first erroneous assumption would be that Dr. Kercher herself (as opposed to other doctors) would personally oversee and administer all aspects of the treatment plan. The second erroneous assumption would be that Dr. Kercher would merely make recommendations to other doctors that could be rejected by them in a manner inconsistent with Dr. Kercher's testimony.

¶56 More broadly, D.E.C. takes issue with the proposition that a treatment plan can pass muster under *Sell* based in significant part on evidence not directly addressed in the report itself. He argues that the circuit court, by failing to explicitly incorporate certain aspects of Dr. Kercher's testimony into the written order or the plan, delegated to the treating physicians in their own professional judgment whether the approved treatment plan complies with *Sell*, contrary to *Green*. *See Green*, 396 Wis. 2d 658, ¶¶43-44. However, D.E.C. fails to provide a supported argument explaining how the due process safeguards required by *Sell* are not meaningfully addressed by interpreting the treatment plan here in light of the detailed, medically and individually based testimony provided by Dr. Kercher, the likes of which were missing in *Green* and *J.D.B.*

¶57 To recap, the circuit court here was informed—through a combination of the contents of the reports it had received, the individual treatment

plan, and Dr. Kercher's testimony on direct and cross examination—as to the specific need for the administration of the antipsychotic medication or medications listed in the plan, in defined dosage ranges and as appropriate for D.E.C. in particular. The court was specifically assured through Dr. Kercher's testimony that doctors would move him from the lowest possibly effective doses of one medication to the same for another medication each time that a given medication was not effective or was causing significant adverse effects. This was sufficient.

¶58 At one point, in explaining its decision, the circuit court observed that only a physician, and not a court, is "qualified to say whether one medication or another medication" is appropriate for a patient. D.E.C. suggests that, in making this observation, the court signaled that it did not understand that the law assigns to courts alone the critical role of determining whether involuntary medication, consistent with a proposed treatment plan, satisfies the *Sell* factors regarding a specific defendant, and that courts are not allowed to delegate that role to individual treatment providers or to any state agency generally. *See Green*, 396 Wis. 2d 658, ¶44 (circuit courts cannot delegate to physicians their responsibilities to determine whether the *Sell* factors have been met). The court's intended meaning in making this particular comment is not entirely clear. But we disagree that the court's challenged ruling violated these legal principles, for reasons we have discussed. Moreover, the court went on to explain that it was rejecting defense requests—which included limiting the treatment plan to the administration of a single medication, aripiprazole—by relying on Dr. Kercher's testimony, based on multiple personal assessments of D.E.C. and an explanation of why it was important and necessary to provide multiple medication options.

¶59 D.E.C. suggests that Dr. Kercher's expression of concern about allowing sufficient "flexibility" in treatment plans to allow the department to make

effective use of plans ignores the fact that the department could return as needed to obtain court approval to add medications or change dosage amounts, under deadlines that D.E.C. submits would not cause undue delay. *See* WIS. STAT. § 971.14(5)(am). The State counters that *Sell* does not require the department to engage in "piece-meal" court-approved treatment, which the State submits would have the practical effect of "preclud[ing] the State from involuntarily medicating anyone due to the strict 12-month maximum period for restoring a defendant to competency once the defendant is committed." *See* § 971.14(5)(a)1.

¶60 It is true that the constitutional standards cannot "bend to accommodate Wisconsin statutory procedures," and instead the procedures "must bend to comply with constitutional standards." *See Green*, 396 Wis. 2d 658, ¶47. Our ruling today does not rest on the State's argument about the practical effects of such a ruling on the ability of the State to cause defendants to be restored to competency in general. But as we have discussed, here Dr. Kercher consistently described what she explained is an effective and safe approach that doctors would use. This included describing reasons to conclude that the medications and dosages listed in the plan hold the prospect of furthering the State's interest at issue consistent with D.E.C.'s right to due process, satisfying *Sell*'s factor two. As part of that record, the circuit court was not presented with evidence establishing that any medication or category of medications in the treatment plan, administered by a doctor consistently with Dr. Kercher's testimony, would not significantly further the State's interest in proceeding to trial with D.E.C.'s competency restored or would result in the risk of side effects likely to interfere significantly with his ability to assist counsel.

¶61 Up to this point in this opinion, we have explained why we reject D.E.C.'s argument that the circuit court erred in denying defense counsel's broad

28

request to deny the requested order based on a disconnect between the terms of the treatment plan and the testimony of Dr. Kercher. On appeal, D.E.C. does not present a developed, separate argument that the circuit court was required, as D.E.C. asked the court in the alternative, to order that the treatment plan be limited to the exclusive administration of aripiprazole or order that the treatment plan be limited to only the second-generation antipsychotics, and therefore we do not separately address those requests.

¶62 In sum on this issue, we conclude that, taking into account the entire record, including both the treatment plan and the hearing testimony, the State proved by clear and convincing evidence that the second *Sell* factor was met.

## II. *Sell* Factor Four: Failure to Show That the Treatment Plan Is Medically Appropriate

¶63 The fourth *Sell* factor requires the State to prove that the planned forced administration of medication is "medically appropriate," which means that administration of medications as specified in the treatment plan would be "in the patient's best medical interest in light of his [or her] medical condition." *See Sell*, 539 U.S. at 181.

¶64 It is true that WIS. STAT. § 971.14(4)(b) imposes an obligation on "whoever administers the medication or treatment to the defendant" to "observe appropriate medical standards." But our supreme court has explained that "*Sell* requires the *circuit court* to conclude that the administration of medication is medically appropriate, not merely that the medical personnel administering the drugs observe appropriate medical standards in the dispensation thereof." *See State v. Fitzgerald*, 2019 WI 69, ¶29, 387 Wis. 2d 384, 929 N.W.2d 165 (emphasis in original).

29

¶65     D.E.C. argues that the State failed to prove that the treatment plan is medically appropriate in multiple respects. We reject D.E.C.'s argument, based in part on Dr. Kercher's testimony about how the plan allows doctors, on a step-by-step basis, to balance the efficacy and the tolerability of each medication referred to in the plan that doctors deem it necessary to try. We address each contention in turn.

¶66     D.E.C. points out that, as summarized above, Dr. Kercher did not dispute defense counsel's assertion that the maximum dosages in the plan for aripiprazole and olanzapine exceed what FDA states are effective dosages. But the circuit court implicitly credited Dr. Kercher's testimony, based on her professional experience, that the treatment plan would benefit D.E.C. without adverse side effects, including potentially moving up to the maximum dosages recommended by the manufacturer if the course of treatment dictated that. At the hearing, defense counsel asked probing questions but did not impeach Dr. Kercher in any significant way and did not present any contrary testimony.

¶67     D.E.C. raises two objections to the inclusion of fluphenazine in the treatment plan. We conclude that both objections are insufficiently supported by the record and forfeited, and we further conclude it would not be appropriate to overlook forfeiture. *See Northbrook Wisconsin, LLC v. City of Niagara*, 2014 WI App 22, ¶20, 352 Wis. 2d 657, 843 N.W.2d 851 ("Arguments raised for the first time on appeal are generally deemed forfeited." (citing *State v. Van Camp*, 213 Wis. 2d 131, 144, 569 N.W.2d 577 (1997))); *State v. Ndina*, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612 ("The purpose of the 'forfeiture' rule is to enable the circuit court to avoid or correct any error with minimal disruption of the judicial process, eliminating the need for appeal."); *Townsend v. Massey*, 2011 WI App 160, ¶25, 338 Wis. 2d 114, 808 N.W.2d 155 ("[T]he forfeiture rule

focuses on whether particular arguments have been preserved, not on whether general issues were raised before the circuit court.").  Application of the forfeiture rule is appropriate in many instances to ensure that parties and circuit courts have "notice and a fair opportunity to address issues and arguments, enabling courts to avoid or correct any errors with minimal disruption of the judicial process."  *See Thompson v. Ouellette*, 2023 WI App 7, ¶13, 406 Wis. 2d 99, 986 N.W.2d 338. That said, the rule is one of judicial administration, and "under appropriate circumstances, we can overlook a party's forfeiture and address the merits of an unpreserved argument."  *See id.*, ¶15.

¶68     D.E.C.'s first objection is based in part on the testimony, summarized above, that Dr. Kercher gave in response to defense counsel's assertion that there has been no "safety testing performed as to doses" of fluphenazine at the plan's listed maximum dosage level of 40 milligrams within a 24-hour period.  She responded that she was not aware of "specific literature," but that she relied on STAHL'S ESSENTIAL PSYCHOPHARMACOLOGY PRESCRIBER'S GUIDE for a maximum dosage.  She further testified that she had "rarely used" a dose for fluphenazine above 20 milligrams, repeating that the approach doctors would use in following the treatment plan would be to start at the lowest dosage level that might be effective and safe.  On appeal, D.E.C. quotes the publicly available FDA "label" for fluphenazine, which states, "Daily doses up to 40 mg may be necessary; controlled clinical studies have not been performed to demonstrate safety of prolonged administration of such doses."  D.E.C. argues that the plan was not medically appropriate because it proposed to "make D.E.C. the guinea pig," but he does not support that assertion.  Defense counsel at the hearing did not ask Dr. Kercher to explain her understanding of the significance of this

statement regarding an absence of controlled clinical studies, leaving us with insufficient context in which to evaluate this argument.

¶69    It would not be appropriate to overlook the forfeiture of this fluphenazine argument.   Assuming without deciding that under a reasonable interpretation of the treatment plan, as explained by Dr. Kercher's testimony, D.E.C. might be subjected to "prolonged administration" (however long that might mean to a psychiatrist) of 40 milligrams of fluphenazine, we lack a sufficient factual basis to conclude that the absence of controlled clinical studies would render that treatment medically inappropriate.   The reasons for applying the forfeiture rule are especially strong here.  *See* ***Gruber v. Village of N. Fond du Lac***, 2003 WI App 217, ¶27, 267 Wis. 2d 368, 671 N.W.2d 692 (application of the forfeiture rule may be especially warranted when the forfeited argument might have been undermined by contrary evidence).

¶70    D.E.C.'s second fluphenazine-related objection is based entirely on one passage in STAHL'S ESSENTIAL PSYCHOPHARMACOLOGY PRESCRIBER'S GUIDE in which the authors suggest that psychiatrists might "consider" using "a mood-stabilizing anticonvulsant" to avoid prescribing a dose of fluphenazine "above normal dosing."   This passage was not shown to Dr. Kercher during her testimony to give her an opportunity to explain her view.   Applying the forfeiture rule is appropriate here as well, because on its face this passage merely suggests one approach to be considered and does not purport to describe what is medically appropriate.

¶71    Separately, D.E.C. argues that it was not medically appropriate to include injectable haloperidol decanoate in the treatment plan, given that D.E.C. was antipsychotic naïve, because the FDA "label" for Haldol states that "patients

32

should be previously stabilized on antipsychotic medication before considering a conversion to haloperidol decanoate." Here again, D.E.C. did not pose this issue to Dr. Kercher, and therefore we lack a proper context to consider it. Applying the forfeiture rule is appropriate in part in light of the unambiguous and unchallenged testimony by Dr. Kercher that doctors "always" administer injectable antipsychotics only after an initial trial on an oral formulation.

¶72    D.E.C. also objects for the first time on appeal to one aspect of the additional medications, specifically the inclusion of an injectable formulation of lorazepam. This appears in the listing of "Benzodiazepine (lorazepam, clonazepam, diazepam)," in the event of "[a]gitation/severe anxiety/insomnia," up to or equal to 10 milligrams within any 24-hour period orally, but injected "if available and indicated based on response and within standard of care by peers." D.E.C. contends that injectable lorazepam is an antianxiety medication used exclusively to sedate, and therefore it could not be an appropriate part of a treatment plan for a patient with schizophrenia. D.E.C. bases this argument on a brief quotation from an article appearing in a National Institutes of Health publication and on the state Department of Health Services form used for purposes of an informed consent for medication—although neither of these sources, so far as D.E.C. suggests, addresses any aspect of the treatment of schizophrenia.

¶73    Disregarding this benzodiazepine argument as forfeited is also appropriate here. There is virtually no end to the details from selected portions of medical literature and regulatory references that a defendant could cobble together in an appeal from an order for involuntary medication that might raise the possibility of an issue with medical appropriateness, at least in the eyes of courts who lack medical training or experience. Here, we could not reasonably reverse the challenged order based on these isolated references now submitted by counsel,

33

when neither this court nor the circuit court was able to consider contextual evidence on this topic by Dr. Kercher or by any other qualified witness.

¶74    D.E.C. argues that the State failed to present the circuit court with clear and convincing evidence of medical appropriateness, and that this is one reason that he must resort on appeal to authority from outside the record.  Put differently, he contends that rejecting his medical appropriateness arguments based on forfeiture amounts to shifting to the defense the State's burden to prove that the plan complies with *Sell*.  It is true that the prosecutor here posed surprisingly few questions to Dr. Kercher regarding the nature of the medications and dosage ranges, and that it was only during cross examination by defense counsel that Dr. Kercher provided her more robust explanations.  We acknowledge that it could be a risky approach for the State to use a minimalist approach on direct examination in these cases, and the defendant does not assume the burden of filling in gaps left by such an approach.

¶75    But we conclude that here, the totality of the evidence that the circuit court had before it by the time of its challenged decision was, in the words of *Green*, a "medically informed record."  *See Green*, 396 Wis. 2d 658, ¶2.  The fact that D.E.C. can now identify publicly available medical details that might have provided additional material for cross examination does not demonstrate a constitutional infirmity.  The State's burden did not require the prosecutor to elicit testimony from Dr. Kercher addressing all potentially disputable aspects of the proposed dosages in the treatment plan.  Further, D.E.C. fails to support an argument that defense counsel could not have, at the time of the hearing, used or used more clearly the publicly available materials that he now cites; these are not materials that have only appeared publicly since the hearing.  Having said that, we

also see no reason to think that doing so would have made a difference in the outcome, given the "medically informed record" before the court.

¶76     D.E.C. briefly asserts that it is "worth noting" that the additional medications were not discussed at the evidentiary hearing. It is true that neither the State nor the defense asked Dr. Kercher about the additional medications. But on its face, this grid has the apparent purpose of listing and briefly explaining additional medications, at specified dosages, that may be used to counteract potential, identified side effects or complications. This would appear to be entirely in the spirit of *Sell*'s direction to allow court review of all medications that might be administered. And, nothing in Dr. Kercher's testimony indicated that the treatment plan included any inappropriate medications. If there was anything in the additional medications that appeared inappropriate to defense counsel, Dr. Kercher was available to testify on that topic.

¶77     Separately, we are sincerely sympathetic to D.E.C.'s expressions of concern on appeal about the time and efforts that criminal defense attorneys must devote in order to mount focused challenges to the testimony of psychiatrists involving complicated medical topics. This is only one of many areas of the law in which much is asked of criminal defense attorneys. But we note that defense counsel here was able to pose illuminating questions to Dr. Kercher focusing on the issues that D.E.C. now raises on appeal. The fact that the circuit court credited all of Dr. Kercher's responses does not take away from the fact that D.E.C. appeared to be ably represented at the evidentiary hearing. Further, the court did not in any way inhibit or cut short the cross examination.

¶78     In sum on this issue, taking into account the entire record, including both the treatment plan and the hearing testimony, the State proved by clear and

convincing evidence that the order for involuntary medication is medically appropriate.

## CONCLUSION

¶79    We conclude that the circuit court did not clearly err or misapply legal standards in determining that the department's involuntary medication of D.E.C., consistent with the individual treatment plan, will significantly further the State's interest in proceeding to trial and that it is medically appropriate.

*By the Court*.—Order dismissed as moot; order affirmed.

Recommended for publication in the official reports.