COURT OF APPEALS
DECISION
DATED AND FILED

February 25, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP2511-CR**

Cir. Ct. No. 2024CF1687

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

L.J.H.,

    DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Kenosha County: ANGELINA GABRIELE, Judge. *Affirmed*.

Before Neubauer, P.J., Gundrum, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. L.J.H. appeals from a circuit court order authorizing the Wisconsin Department of Health Services to involuntarily medicate L.J.H. for the purpose of restoring him to competency so that he may stand trial in a criminal case. *See* WIS. STAT. § 971.14 (2023-24).[1] On appeal, L.J.H. argues the involuntary medication order violates his right to due process because it fails to meet the factors required under *Sell v. United States*, 539 U.S. 166, 180-82 (2003). Specifically, L.J.H. asserts the proposed treatment plan failed to include necessary information and the State's interest in his prosecution was undermined by the special circumstances of this case. The State responds, in part, that this appeal is moot because L.J.H. is no longer subject to the involuntary medication order. We assume without deciding that this appeal is not moot. On the merits and for the reasons explained below, we affirm the circuit court's involuntary medication order.

## BACKGROUND

¶2 The State charged L.J.H. with threat to a law enforcement officer, possession of THC as a second and subsequent offense, obstructing an officer, possession of drug paraphernalia, and disorderly conduct. Those charges arose from a November 2024 incident when employees of a convenience store found L.J.H. drinking alcohol inside the store, told L.J.H. to stop, and L.J.H. responded by throwing a drink at an employee. Police were called, and L.J.H. was uncooperative and refused to provide his name. L.J.H. told an officer he would "break your face" and "tackle you down." Police arrested L.J.H. and found a vape pen in his pocket along with a substance that field-tested positive for THC.

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

¶3      At his initial appearance, L.J.H.'s competency was questioned.  A psychologist diagnosed him with "[u]nspecified schizophrenia spectrum and other psychotic disorder; and [u]nspecified personality disorder (by history)." Following an evidentiary competency hearing, L.J.H. was found incompetent but likely to become competent.  He was committed to the custody and care of the Department of Health Services on January 22, 2025.

¶4      On June 18, 2025, L.J.H. received a placement at Sand Ridge Secure Treatment Center.  On July 1, 2025, Dr. Andrew Kordus filed a treatment plan with the circuit court that requested an involuntary medication order.  Kordus's treatment plan listed the specific medications he would use to treat L.J.H., the order he would try them, and how they would be administered.

¶5      As relevant to the arguments presented in this appeal, Kordus explained he would start treating L.J.H. with Risperdal because L.J.H. had responded well to it in the past.  Kordus indicated that Risperdal is given orally in a daily dosage range of 2 mg-8 mg.  L.J.H. had previously received 4 mg of Risperdal during treatment to competency at Mendota Mental Health Institute and 6 mg of Risperdal during a hospitalization at Winnebago Mental Health Institute in 2016.  Kordus proposed to start L.J.H. on 2 mg of oral Risperdal at bedtime, and Kordus would increase L.J.H.'s dosage by 1 mg per week until a response was noted.  Kordus stated that if L.J.H. responded well to Risperdal and L.J.H.'s symptoms improved, Kordus "would like to transition him to the long acting injectable (either Risperdal Consta or Risperdal Uzedy)."

¶6      If L.J.H. did not respond well to Risperdal, Kordus would taper him off and begin treatment with olanzapine.  The plan specified that olanzapine would be started at a low dose (10 mg at bedtime) and it could be increased up to a

maximum dose of 30 mg at bedtime. Kordus would wait two or three weeks to see if olanzapine improved L.J.H.'s symptoms, and the doses would be increased in two-week intervals by 5-10 mg.

¶7 The plan stated that if olanzapine was not effective, Kordus would try Haldol. Haldol would be started at 5 mg daily and could be increased up to 20 mg daily at bedtime or split throughout the day depending on L.J.H.'s preference. Once at 20 mg daily, Kordus would check the levels of Haldol in L.J.H.'s blood to ensure that L.J.H. was not metabolizing the medication too quickly.

¶8 Finally, the plan provided that, if L.J.H. "refuses doses of the medication," Kordus would use as a "back up" an injectable medication. Specifically, he would use the injectable form of olanzapine, which could be given at doses between 10 mg and 20 mg, or Haldol, which could be given in doses of 5 mg and 10 mg.

¶9 The circuit court held an evidentiary hearing during which Kordus testified. As relevant, Kordus testified that his treatment plan included the maximum and minimum dosages of the medication that would be administered. Following the hearing, the court issued an involuntary medication order. L.J.H. appeals. Additional facts will be discussed below.

## DISCUSSION

¶10 "[C]ircuit courts may order involuntary medication to restore trial competency under [WIS. STAT.] § 971.14 only when the order complies with the *Sell* standard." *State v. Fitzgerald*, 2019 WI 69, ¶2, 387 Wis. 2d 384, 929 N.W.2d 165. In *Sell*, the Court "established a four-factor test to determine whether such

4

medication [for competency purposes] is constitutionally appropriate." *Fitzgerald*, 387 Wis. 2d 384, ¶13. Specifically, the State must prove by clear and convincing evidence that: "(1) the State has an important interest in proceeding to trial; (2) involuntary medication will significantly further that State interest; (3) involuntary medication is necessary to further that State interest; and (4) involuntary medication is medically appropriate." *State v. D.E.C.*, 2025 WI App 9, ¶32, 415 Wis. 2d 161, 17 N.W.3d 67.

### I. Mootness

¶11    As a threshold matter, the State argues this appeal is moot because L.J.H. is no longer subject to the involuntary medication order. L.J.H. argues the appeal is not moot. For purposes of this appeal, we assume without deciding that the appeal is not moot. We will decide this appeal on the merits.

### II. Treatment plan

¶12    "[A]n individualized treatment plan is the necessary first step to fulfilling the second, third, and fourth *Sell* requirements." *See State v. Green*, 2021 WI App 18, ¶37, 396 Wis. 2d 658, 957 N.W.2d 583. A treatment plan proposed by the State must:

> "[a]t a minimum," identif[y] "(1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court."

*Id.*, ¶38 (citation omitted).

¶13    On appeal, L.J.H. argues the proposed treatment plan was not sufficiently individualized and the medication order should be vacated because the plan "did not include the frequency of administration of any injectable medications." He first faults the plan for not specifically indicating how often and how much he would receive of the injectable forms of olanzapine or Hadol. L.J.H. also argues "[m]ore egregiously, the plan includes zero dosing information for the proposed long-acting injectables, Risperdal Consta or Risperdal Uzedy."

¶14    The State responds that L.J.H. fails to consider the treatment plan as a whole as well as Kordus's testimony from the evidentiary hearing. The State emphasizes that Kordus specifically detailed in milligrams the maximum daily dosages of the medication. The State asserts the fact that the maximum daily milligram doses were discussed in the oral medication portion of the report makes no difference when the "back up" injectable forms of the medication were then also presented in milligrams. Accordingly, the State argues that L.J.H.'s frequency-of-administration arguments are not relevant when, as here, the plan identifies the maximum daily dosage of the medication.

¶15    We agree with the State. First, the proposed treatment plan included a detailed description of the oral medication, the minimum and maximum dosages, and the frequency of administration. Specifically, Kordus would start with Risperdal. Kordus outlined the initial oral dosage amount (2 mg), how often it would be administered (daily at bedtime), how the dosage would be increased (1 mg per week as needed), and the maximum dosage amount (8 mg daily). If Risperdal did not work, Kordus would try olanzapine. Again, Kordus outlined the initial oral dosage amount (10 mg), how often it would be administered (at bedtime), how the dosage would be increased (in 5-10 mg doses as needed), and the maximum dosage amount (30 mg orally at bedtime). Then, if olanzapine did

not work, Kordus would try Haldol. As before, Kordus outlined the initial dosage amount (5 mg), how often it would be administered (daily) and then explained he could increase it up to a daily 20 mg dose.

¶16    At this point, based on the various scenarios outlined in the proposed treatment plan, we know that on a daily basis L.J.H. would either receive between 2 mg and 8 mg of Risperdal, 10 mg and 30 mg of olanzapine, or 5 mg and 20 mg of Haldol. With that background, Kordus then stated if L.J.H. "refuse[d] doses of the medication," Kordus would administer an injectable dose of olanzapine, "which can be given between 10mg-20mg" or Haldol, "which would be able to be given [at] 5-10mg."

¶17    Based on the proposed treatment plan and the record created at the evidentiary hearing, it is entirely reasonable to conclude that if L.J.H. refused medication, Kurdos would follow the same plan as outlined in his discussion of the oral medication but simply use an injectable form of olanzapine or Haldol. As such, it is apparent that the injectable forms of olanzapine and Haldol would be given on the same daily, and up to the maximum, dosage amount as Kordus detailed in his discussion of the oral form of the medication. We conclude the treatment plan is sufficiently individualized in its discussion of olanzapine and Haldol.

¶18    L.J.H. nevertheless argues that it is not appropriate for the court to assume the injectable forms of the medication would be administered daily or up to the same maximum doses as outlined for the oral medication. However, we note the lack of defense questioning on this topic at the evidentiary hearing. The evidence the State presented at the involuntary medication hearing established by clear and convincing evidence the maximum daily milligram amounts of the

medication that would be administered to L.J.H. regardless of form. L.J.H.'s decision not to question Kurdos on any differences between oral and injectable forms of the medication exposed him to the risk that, on the evidentiary record before it, the circuit court would accept the uncontested representations in the individualized treatment plan that, regardless of form, the maximum daily doses of the medication would be the same.

¶19 Further, and contrary to L.J.H.'s arguments, the plan before us is entirely unlike the treatment plan we rejected in *State v. J.D.B.*, 2024 WI App 61, ¶¶17, 56-61, 414 Wis. 2d 108, 13 N.W.3d 525, *review granted*, 2025 WI 8, 18 N.W.3d 694. In *J.D.B.*, among other deficiencies, the proposed treatment plan "contained no details with respect to how often a dose of any particular medication would be administered" and "did not outline an order in which each of these medications would be tried." *Id.*, ¶¶17-18. As explained above, Kordus's treatment plan provided the maximum daily doses of the various forms of the medication in milligrams. It also includes a detailed discussion of the order in which the medication would be administered and how the dosage would be increased.

¶20 Turning to L.J.H.'s arguments regarding the long-acting injectable form of Risperdal, we observe that, as discussed above, the proposed treatment plan stated the maximum daily dosage of Risperdal was 8 mg. From the evidentiary record created at the hearing, there is no indication that the long-acting version of Risperdal would be inconsistent with the other recommended daily dosage amount.

### III. Special Circumstances

¶21    L.J.H. next argues special circumstances undermined the State's interest in prosecuting him. This argument relates to the first *Sell* factor—whether the State has an important interest in proceeding to trial. *See Sell*, 539 U.S. at 180. Pursuant to *Sell*, the State's "interest in bringing to trial an individual accused of a serious crime is important." *Id.* However, under the first *Sell* factor, it is not enough that the State simply establishes a "serious crime." *J.D.B.*, 414 Wis. 2d 108, ¶37. Special circumstances unique to each defendant may lessen the importance of the State's interest in prosecution. *Id.*, ¶¶37-38. These circumstances may include "the potential for future civil commitment, and the length of pretrial detention." *Id.*, ¶38.

¶22    On appeal, L.J.H. appropriately concedes he was charged with a "serious crime"—namely, threat to a law enforcement officer. He then argues "[t]he circuit court failed to consider whether the State's interest in prosecution was undermined by the special circumstances of this case."

¶23    In support of his special-circumstances argument, L.J.H. points to the length of his pretrial detention. L.J.H. compares his situation to the one in *J.D.B.* There, we concluded special circumstances undermined the State's interest in prosecution. *See J.D.B.*, 414 Wis. 2d 108, ¶53. L.J.H argues that because his pretrial detention exceeded that of J.D.B.'s (L.J.H. was committed for 152 days before he was transported to an inpatient facility, and J.D.B. was committed for 106 days before transport), we should conclude special circumstances undermined the importance of the State's interest in his prosecution. *See id.*, ¶¶11-12.

¶24    L.J.H. also argues the circuit court failed to consider the sentence credit he had accrued at the time the court ordered involuntary medication. He

contends that, at the time the court entered the involuntary medication order, he had been in custody for 259 days and would have received credit for that time.

¶25 We conclude special circumstances do not undermine the State's interest in prosecuting L.J.H. First, contrary to L.J.H.'s suggestion, our conclusion in *J.D.B.* was not based solely on the length of pretrial detention. In *J.D.B.*, it was the combination of many sets of special circumstances that led to our conclusion that special circumstances undermined the State's prosecution in that case. *Id.*, ¶53. All of those factors do not exist in this case.

¶26 For example, in *J.D.B.*, J.D.B. was a "first-time, then-nineteen-year-old offender." *Id.* Here, by contrast, the record reflects that L.J.H. has a criminal record and, based on the allegations in the current complaint, continues to be unable to conform his conduct to society. Additionally, in *J.D.B.*, the record reflected "a significant potential for [J.D.B.'s] future civil commitment" through either WIS. STAT. ch. 51 proceedings or by successfully asserting an NGI defense at trial. *J.D.B.*, 414 Wis. 2d 108, ¶41. In this case, the record does not reflect and no argument has been made that there is "a significant potential for [L.J.H.]'s future civil commitment." *See id.*

¶27 That said, we recognize that the delay in L.J.H. receiving a placement at an inpatient facility and the total amount of accrued sentence credit may have to some degree lessened the State's interest in prosecution. *See id.*, ¶¶52-53. However, the record reflects that, at the time of the involuntary medication order, L.J.H., who had a prior criminal record, was charged with two felonies and three misdemeanors. On the felony counts alone, L.J.H. faced a maximum sentence of nine years and six months' imprisonment. Therefore, although the special circumstances highlighted by L.J.H. (i.e., the length and

circumstances of his pretrial detention and his accrued sentence credit) may have lessened the State's interest in prosecuting him, we conclude those circumstances fall short of "totally undermin[ing]" the State's interest in his prosecution. *See Sell*, 539 U.S. at 180.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

11